[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1085 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1086 
The appellant was indicted and convicted for the murder of Terry Dewayne Diayck by shooting him with a shotgun in violation of Alabama Code § 13A-6-2 (Supp. 1977). The trial court fixed his punishment at twenty years in the state penitentiary. At arraignment, in the presence of counsel, appellant pleaded not guilty. He is represented on this appeal by the same court-appointed counsel who represented him at trial and has been furnished with a free transcript.
Mary Catherine Diayck testified that the victim in this case was her son. Through her testimony the state established the corpus delicti.
Sergeant Albert Wallace of the Birmingham Police Department testified that he went to an address in Birmingham located at 2332 Tenth Court South, Apartment 7, at approximately 10:20 p.m. on June 23, 1980. Sergeant Wallace observed that the victim had been shot in the forehead and "his head more or less exploded." He stated that the wound was consistent with wounds inflicted by a shotgun and was of a type reasonably calculated to cause death. Sergeant Wallace identified State's Exhibit 1, a photograph of the victim, as accurately depicting the body as he observed it.
Billy Limbaugh testified that the victim was his roommate at the above address on June 23; that their apartment was upstairs. Limbaugh stated that he was talking to a girl named Linda on the telephone when he heard a noise at the door. Limbaugh testified that as the victim went to answer the door, the door "was slung open and . . . two black males entered the door with a shotgun." The man with the shotgun was approximately six feet tall and slender. The other man was shorter and had a medium build. The two assailants directed the shotgun towards the victim and said, "Give me the money, MF." Limbaugh testified that the victim, who was standing in front of the door, "grabbed the shotgun and tried to take it away from them." At that point a struggle ensued between the victim and his assailants and "all three of them fell out of the door." Limbaugh stated that, as he was coming out of his chair by the telephone, he had eye-to-eye contact for a couple of seconds with the shorter man. "I saw a surprised look on his face. . . . And then he had a dazed look on his face." Limbaugh testified that, after he had taken *Page 1087 
two steps, the gun went off. Limbaugh next saw the victim's body lying in the hallway. "His head was gone, most of it was gone." The assailants ran from the scene and the police were notified. Limbaugh stated that he could not "positively" identify either of the black males.
On cross-examination Limbaugh testified that the night prior to the killing his truck had broken down in Woodlawn and that three black males had taken him home. They took him home in a light colored Buick. Limbaugh stated that the black males came inside his apartment and he paid them five dollars from his wallet. He estimated there were between three and four hundred dollars in his wallet at the time and that the black males saw the money. Limbaugh "felt like the tall one . . . with the shotgun, resembled the driver of the Buick." He thought that appellant was one of the other black males who had been in the apartment the previous night. Limbaugh also saw a light colored Buick leave the scene after the victim was killed. He heard the two men yell, "We will get you," as they left in the Buick.
Limbaugh stated that he had made a positive identification of appellant as one of the two assailants on prior occasions, but that he had never been "a hundred percent sure." Limbaugh reiterated that on the night in question appellant had a "shocked look on his face . . . [H]e was surprised to see me coming — standing up and come forth." Limbaugh admitted that he had been shown photographs at family court a week or two after the shooting, but that he had not identified appellant. He later learned that appellant's photographs had been included in the group he was shown. Limbaugh testified that he really had not been interested in selecting a photograph at that time because he was under psychiatric care "because of the shock and everything."
Limbaugh further testified that he met a young woman, Jackie Moore, for the first time the night of the murder. "I saw her in the hallway, downstairs hallway in my apartment." Limbaugh stated that Ms. Moore was upset.
During redirect examination Limbaugh testified that he based his identification of appellant "on his face, the look on his face when I saw him in the apartment that night."
Detective James Parker of the Huntsville Police Department testified that, on the afternoon of June 24, 1980, he, Detective Jim Crumrine and Detective Larry Brewer went to an address located in Huntsville at 1900 Magnum Drive looking for appellant. He observed a partially opened garage door and someone running from the garage into the house. Appellant was later found inside the house hiding in a closet. Appellant was placed under arrest at that time. The testimony of Detective Jim Crumrine was substantially the same as that of Detective Parker.
Ms. Jackie Ann Moore testified that, after she left work at "Burley Earl's" on June 23, she arrived at the apartment of a friend named Ronald at 9:00 or 9:30 p.m. Ronald's apartment was located in the alley of 10th Court South behind Limbaugh's and the victim's apartment. Ms. Moore stated that she left Ronald's apartment about 10:00 p.m. and that, as she tried to open the door to her car, appellant placed a shotgun in her side. Appellant told her, "I know you seen it, I know you know and I am going to get you." Ms. Moore stated that she turned around, appellant "slid" the gun "into my stomach, and I went to my knees." Appellant was approximately one-half of a foot away from the witness. Ms. Moore testified that, while she was on her knees appellant said the "JA of my name, Jack," and that the other man in the background called, "Vince, come on Vince." Appellant then "turned around and took off running." Ms. Moore testified that she next ran to the "Wooden Nickel" across the street and that some friends later walked her back to the scene to tell her story to the police. She later went to the police station where she picked out the appellant's photograph.
Ms. Moore further stated that she knew appellant from the 13th Place runaway house, that she knew him personally from January to February of 1980. She stated *Page 1088 
that she told the police "Vincent Walker's" name when she walked back to the scene that night. She further testified that the night of the murder there were several lights "shining off the apartment building" where her car was parked. Ms. Moore denied going to Ronald's apartment to obtain marijuana.
Sergeant Wallace was recalled and testified that he saw Ms. Moore on June 23 and during the early morning hours of June 24. He stated that Ms. Moore gave him the name of the man who pulled the shotgun on her on that occasion.
Following Sergeant Wallace's testimony the state rested its case and appellant's motion to exclude was overruled. Appellant's sole defense was alibi. He denied being in Birmingham the night of the murder, claiming instead to have been in Huntsville.
Ms. Mary "Shelby" James testified for appellant that she was Jackie Moore's half cousin and was also a counselor at the 13th Place runaway house for abused and neglected children. Ms. James stated that Ms. Moore had lived for a time at 13th Place because of "problems at home." Ms. James stated that Ms. Moore's general reputation in the community and her general reputation for truth and veracity were bad. Ms. James testified that she also knew appellant from 13th Place.
Ms. James testified that she saw Ms. Moore around 1:30 a.m. on June 24, 1980, when she left the police station. Ms. Moore told her that she had been to some apartments across from the "Wooden Nickel" and that appellant "had stuck a gun into her." Ms. Moore also told her she had gone to the apartment "to try to get a joint."
Following Ms. James' testimony Billy Limbaugh was called by appellant. His testimony for the defense did not add significantly to his testimony for the state.
Ms. Chris Humphrey, a social worker with the Department of Pensions and Security, testified that appellant was at Harris Home in Huntsville in May of 1980. She stated that appellant was transferred from Harris Home to Birmingham on May 30, to the family court's cottage. Ms. Humphrey testified that she met appellant at the Trailways Bus Station in Birmingham and that, when he got out of the car at family court, "he ran away."
Following Ms. Humphrey's testimony and certain voir dire testimony, Ms. Jackie Moore was called as a witness by appellant. Her testimony as a defense witness will be discussed later in this opinion.
Irvin John Plummer testified that he had employed appellant in Huntsville, that appellant had worked half a day on June 23. He later saw appellant that night in front of the Rocket Quikstop in Huntsville between 9:30 and 9:45. Plummer stated that appellant smiled, called his name and waved when he passed by.
Richard Harris testified that he was employed with appellant and that he, too, saw appellant in Huntsville on June 23, around 8:15 p.m. Then around 9:00 p.m. he saw appellant on the road to the basketball court.
Robert Thompson also stated that he saw appellant in Huntsville around 9:00 p.m., on June 23, that he (Thompson) was with Richard Harris when he saw appellant.
Ms. Robbie D. White testified that she was an official court reporter in Judge Joseph Jasper's courtroom and that she took shorthand notes of appellant's habeas corpus proceedings. She had the transcribed notes of Jackie Moore's testimony on that occasion. Ms. White was questioned in regard to Ms. Moore's prior testimony in an attempt to bring out inconsistencies.
Mr. John Fox, an attorney with the public defender's office, stated that he represented appellant at the family court hearing and that he cross-examined Jackie Moore's testimony on that occasion. Mr. Fox testified that Ms. Moore's prior testimony was that "Slick" Limbaugh was the one who told her the name Vincent Walker.
Darius King testified for appellant that he saw appellant around 10:00 p.m. on June 23 at James Stewart's house in Huntsville. *Page 1089 
Appellant testified in his own behalf that he had been in Huntsville the night of the murder. His testimony concerning his whereabouts that evening was in most respects similar to that of the earlier alibi witnesses who had testified for him. Appellant denied being in Birmingham on the day in question and killing the victim. He admitted that he had run away from Chris Humphrey on May 30. He testified that he had gone back to Huntsville.
Ms. Mary James was called on rebuttal by the state and testified that appellant's general reputation at the 13th Place for truth and veracity was bad.
Mrs. Elise Barclay of the Jefferson County District Attorney's Office testified that she represented the state at the family court hearing where appellant was represented by Mr. Fox. Mrs. Barclay testified that at no time during the proceeding did Jackie Moore state that she got the name Vincent Walker from "Slick" Limbaugh.
Viewing the evidence presented by the prosecution in its most favorable light, as we are required, Livingston v. State,44 Ala. App. 559, 216 So.2d 731 (1968), it is clear that such evidence was sufficient to prove appellant's guilt beyond any reasonable doubt. The evidence before the trial court at the time the motion to exclude was made is all that can be considered in reviewing the trial court's overruling of such motion. McCord v. State, 373 So.2d 1242 (Ala.Cr.App. 1979). Even though the state presented no eyewitness who saw the actual shooting and many of the facts surrounding this bizarre incident are circumstantial in nature, circumstantial evidence standing alone is sufficient to support a conviction for murder. Dolvin v. State, 391 So.2d 133 (Ala. 1980); AnthonyTyrone Washington v. State, Ala.Cr.App., 415 So.2d 1175 [1982]. As in Washington, supra, there was evidence in this case of flight by appellant to avoid prosecution after the murder.
It is not the province of this court to reweigh the evidence.Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied,368 So.2d 877 (Ala. 1979). The weight of the evidence, the credibility of the witnesses, and inferences to be drawn from the evidence, where susceptible of more than one rational conclusion, are for the jury alone. Willcutt v. State, 284 Ala. 547, 226 So.2d 328 (1969). As this court stated in Scroggins v.State, 341 So.2d 967 (Ala.Cr.App. 1976), cert. denied,341 So.2d 972 (Ala. 1977):
 "Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this court has no right to disturb the verdict of the jury. Whether there is such evidence is a question of law, its weight and probative value are for the jury. Haggler v. State, 49 Ala. App. 259, 270 So.2d 690.
 "Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction, the denial of a motion to exclude the State's evidence, the refusal to give the affirmative charge and the denial of a motion for new trial, do not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843."
And a conflict between the state's case and appellant's alibi presents a question for the jury. Zimmerman v. State,49 Ala. App. 442, 272 So.2d 914 (1973). Any conflicts in the evidence were for the jury to resolve. May v. State,335 So.2d 242 (Ala.Cr.App. 1976).
The trial court committed no error in admitting State's Exhibit 1, a photograph of the victim taken at the scene. Cases are legion that photographs are admissible in evidence if they prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge. Fletcher v. State, 291 Ala. 67, 277 So.2d 882
(1973). Photographs which depict the character and location of external wounds on the body of a deceased victim are admissible even though they are cumulative evidence based upon an undisputed matter. *Page 1090 Ellenburg v. State, 353 So.2d 810 (Ala.Cr.App. 1977). The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury. Carpenter v. State, 400 So.2d 417
(Ala.Cr.App.), cert. denied, 400 So.2d 427 (Ala. 1981).
Appellant contends that reversible error was committed when, during a verbal exchange between defense counsel and one of the assistant district attorneys over the proper manner to voice an objection, the assistant district attorney directed the following comment to the defense counsel: "We object to that, it is argumentative, it is improper and he knows it." Appellant's objection to this remark was sustained by the trial court and the jury was instructed that "what the attorneys say is not evidence." Appellant's motion for a mistrial was overruled.
We disagree that appellant's motion for a mistrial was due to be granted on the basis of the above comment. The evaluation of alleged prejudicial remarks by the prosecution must be determined on the merit of each case. Edwards v. State,56 Ala. App. 405, 321 So.2d 744 (1975). While we do not condone the remark by the prosecutor which suggested that defense counsel would knowingly ask an improper question, we cannot say from a review of the record that the remark was so prejudicial as to have warranted a mistrial. Scroggins, supra. The granting or denying of a motion for mistrial is a matter within the sound discretion of the trial court which will only be disturbed upon a showing of manifest abuse; no such abuse is evident here.Durden v. State, 394 So.2d 967 (Ala.Cr.App. 1980), cert. quashed, 394 So.2d 977 (Ala. 1981). It should be noted that appellant's objection to the remark was sustained and that the trial court took further curative action by admonishing the jury.
During appellant's case-in-chief, appellant called Ms. Jackie Moore as a defense witness. Ms. Moore, it should be remembered, had testified earlier as a key identification witness for the state. On her direct examination by defense counsel, Ms. Moore testified, without objection, that she had previously told a fabricated story concerning the incident to a relative, Ms. Shirley Burnett. On cross-examination by the state Ms. Moore explained why she had told the fabricated story. Then, during Ms. Moore's redirect examination, defense counsel attempted to "impeach" Ms. Moore's explanation of the fabricated story by asking the witness if she remembered "being asked the question —" when she testified at an earlier habeas corpus proceeding regarding the murder. The prosecution objected to defense counsel asking Ms. Moore any questions concerning whether she gave certain testimony at the habeas corpus proceeding without first showing Ms. Moore the transcript of the proceedings. After several pages of argument between the prosecution and defense counsel and instructions by the trial judge, as disclosed in the record before us, the trial judge sustained the prosecution's objection and defense counsel ultimately refused to show Ms. Moore the habeas corpus transcript or ask her any further questions, stating instead that "the error is in the record and the court of appeals will see to it."
Appellant argues in brief that the trial court's ruling on this matter denied him the right to confront and thoroughly "cross-examine" Ms. Moore, that he was erroneously prevented from laying a "proper predicate for impeachment." And it is unmistakably clear from the record that appellant's purpose in questioning Ms. Moore on redirect examination was to "cross-examine" her and "impeach" her testimony. Appellant did not claim "surprise" at Ms. Moore's testimony on redirect and made only one fleeting reference during several pages of argument with the prosecution and the trial court to "refreshing recollection." Appellant at no time stated that he was attempting to refresh Ms. Moore's recollection; rather he stated on redirect that he was attempting "to conduct an impeachment."
As a general rule a party may not impeach his own witness by showing that he is unworthy of belief or by proving that he has made contradictory statements. *Page 1091 Flournoy v. State, 270 Ala. 448, 120 So.2d 124 (1960); C. Gamble, McElroy's Alabama Evidence § 165.01 (6) (3rd Ed. 1977) (hereinafter cited McElroy's Alabama Evidence). However, if a witness' testimony about a matter is adverse to the party who called the witness, it is proper for the trial court to permit such party, either for the purpose of showing such party's surprise at the witness' testimony or for the purpose of refreshing the recollection of the witness and thereby inducing the witness to change such testimony, to inquire of the witness whether he has previously made and to elicit testimony from him that he has previously made certain statements about the matter different from his present testimony and favorable to the party calling him as a witness. Allen v. State, 51 Ala. App. 413,286 So.2d 88 (1973); McElroy's Alabama Evidence § 165.01 (7)(a). This exception to the general rule equally applies on a party's redirect examination of his own witness after the witness has given testimony on cross-examination in conflict with his testimony on direct examination. Jarrell v. State, 35 Ala. App. 256, 50 So.2d 767 (1949); McElroy's Alabama Evidence, § 165.01 (7)(b).
Stated another way, a party may ask his witness, for the purpose of refreshing his memory or of showing that he had been put at a disadvantage by unexpected evidence, whether, at a certain time and place, he has not made certain statements inconsistent with his testimony on the stand, even though the admission of such inconsistent statements will injuriously affect the witness' credibility with the jury. White v. State,87 Ala. 24, 5 So. 829 (1889). But this cannot be done when the purpose and only effect of such evidence is to impeach the witness. White, supra; Gandy v. State, 81 Ala. 68, 1 So. 35
(1887). It should be noted that if a witness who has already been called and testified as a witness of one party is subsequently called by another party as his witness, that witness also becomes the witness of the other party and cannot be impeached by that other party. Gandy, supra; McElroy'sAlabama Evidence, § 171.01 (4). As was stated by the Supreme Court in Gandy, supra:
 "It was not permissible for the defendant to lay the predicate, as attempted by him, for the avowed purpose of impeaching the witness Belle Gordon, by proving contradictory statements previously made by her. She was his witness for the time being, and could not be thus impeached. . . ." 1 So., at 36.
Even though Ms. Moore had previously testified as a state witness and appellant had conducted a cross-examination of her at that point, that fact did not provide appellant with carte blanche to continue such cross-examination when he subsequently elected to call Ms. Moore as his witness. When appellant called Ms. Moore as his witness, he did not request the trial court to have her declared an adverse or "hostile" witness. Anderton v.State, 390 So.2d 1083 (Ala.Cr.App.), cert. denied,390 So.2d 1087 (Ala. 1980). Indeed, there was no showing by appellant that Ms. Moore was an adverse or hostile witness; at most, appellant could have expected Ms. Moore to give "unfavorable" testimony as his witness. See Wiggins v. State, 398 So.2d 780
(Ala.Cr.App.), cert. denied, 398 So.2d 783 (Ala. 1981). Nor does the record in this case support a finding that appellant specifically reserved a right to recall Ms. Moore for further cross-examination or that the court granted such a reservation.Hall v. State, 51 Ala. 9 (Ala. 1874); Baxter v. State,360 So.2d 64 (Ala.Cr.App. 1978). Even if appellant had requested the right to recall Ms. Moore at the conclusion of his cross-examination of her as a state witness, which he did not do, a trial court has discretion to allow or disallow a witness to be recalled for further cross-examination. Baxter, supra.
A trial court should not allow a state witness to be "recalled" by the defense during its case-in-chief for purposes of further cross-examination and impeachment on matters to which the witness had previously testified. As Judge Bowen wrote for this court in Baxter, supra:
 "Thus, absent surprise, defense counsel will be prepared to lay the foundation for *Page 1092 
impeaching a complaining witness in the usual course of cross examination during the state's presentation of its case. Here the record discloses no reason why defense counsel should have been permitted to recall the complaining witness for further cross examination. The conflict presented between her testimony and that of the appellant was clearly a question for the jury. After the state had rested and the defendant presented all his witnesses, the defendant had no right to recall the prosecutrix for purposes of further cross examination and impeachment on matters to which she had previously testified and which conflicted with the testimony given by the appellant. Such a course would convert the trial into an endless display of refutation and rebuttal." 360 So.2d 66, 67.
Appellant simply made no demonstration or request in this case to place Ms. Moore on the witness stand in any other capacity than as a defense witness.[1] Normally, in the trial of a cause a witness called by a party becomes that party's witness. It is presumed that when a party places a witness on the stand he vouches for the witness' credibility and cannot impeach him. Ward v. State, 376 So.2d 1112 (Ala.Cr.App.), cert. denied, 376 So.2d 1117 (Ala. 1979). If this norm is not to be followed and a party desires to place a witness on the stand in the unusual capacity of being the other party's witness, the calling party should clearly designate in the record, at the time he places such witness on the stand, for what purpose the witness is being called. The burden is on the accused to see that the record is perfected for appeal. Heard v. State,351 So.2d 686 (Ala.Cr.App. 1977). Following this reasoning then, we are of the opinion that the rule in Gandy, supra, which is set out above, is the appropriate rule in this came and whether appellant intended it or not Ms. Moore became his witness at the time he placed her on the witness stand in his case-in-chief.
As stated previously, appellant did not claim "surprise" at Ms. Moore's testimony on his redirect examination of her, nor did he contend that his purpose in asking her about the allegedly inconsistent prior testimony was to "refresh her recollection." Appellant made it crystal clear for the first time during his redirect examination of Ms. Moore that his purpose in calling her as a witness was to "cross examine" her and to "impeach" her testimony. This situation is treated thoroughly in McElroy's Alabama Evidence, § 165.01 (7)(f) as follows:
 "An avowal of the party's purpose in seeking to elicit testimony from his own witness of the latter's having made the supposed prior inconsistent statement is important. A trial court's sustention of an objection to a party's question to his own witness seeking to elicit testimony from him that he had previously made a statement inconsistent with his present testimony, without an avowal by the party of the purpose for eliciting such testimony, will be affirmed because it will be presumed that the party's purpose was to impeach his own witness. It has been a traditional rule that a party does not have the right to elicit from his own witness testimony that such witness has made a prior inconsistent statement, for the avowed purpose of impeaching such witness. Stated differently, when a party begins to question his own witness about a prior inconsistent statement he should be careful to avow that his purpose is to show surprise or to refresh the witness's recollection."
(Emphasis added.)
Thus, since Ms. Moore became appellant's witness during his case-in-chief and appellant's "avowed purpose" in calling her was for the decidedly improper purpose of impeaching her testimony, appellant cannot *Page 1093 
cry foul in the trial court's ruling which, in effect, prevented him from impeaching his own witness. If a trial court's ruling is correct for any reason, the trial court will not be put in error for assigning the wrong reason therefor.Harnage v. State, 290 Ala. 142, 274 So.2d 352 (1972).
Assuming arguendo that Ms. Moore remained a state witness at the time appellant called her and placed her on the witness stand during his case-in-chief and that appellant properly had the right to continue his cross-examination of her[2], appellant did not lay the proper predicate for impeaching Ms. Moore's testimony with her prior sworn testimony at the habeas corpus proceeding. At the time appellant attempted to impeach Ms. Moore's explanation for telling the fabricated story about the murder to her relative, it would have first been necessary for appellant to show the witness the transcript[3] of the habeas corpus proceeding before asking her questions concerning that prior sworn testimony. Parker v. State, 266 Ala. 63,94 So.2d 209 (1956). Appellant did not ask Ms. Moore whether or not she remembered testifying at the habeas corpus proceeding; rather his question was: "Ms. Moore, when you testified at the habeas corpus hearing, do you remember being asked the question —."
(Emphasis added.) In Parker, supra, the Supreme Court stated that, where a party desires to cross-examine a witness concerning a prior statement written or signed by the witness, or prior testimony by the witness, if the statement is to be later introduced into evidence to impeach the witness, the statement must first be shown to the witness in order to allow the witness to refresh his memory and to explain any inconsistency.[4] 94 So.2d, at 214. The Supreme Court in Parker, supra, referred to the case Wills v. State, 74 Ala. 21 (1883) and cited the following rule from Wills:
 "A witness is not bound to answer to a matter reduced to writing by himself or another, and subscribed by him, until the writing has been produced and read or shown to him." 74 Ala., at 24.
It has specifically been held that a transcript from a preliminary hearing containing previously given sworn testimony of a witness must be shown to him before being used to impeach.Massey v. State, 49 Ala. App. 345, 272 So.2d 271, cert. denied,289 Ala. 747, 272 So.2d 278 (1972); See McElroy's AlabamaEvidence § 158.01.
Thus, even if appellant's position that he should have been allowed to "impeach" Ms. Moore's testimony on his redirect examination was accepted as correct, which we opine is not the correct posture he should have been allowed to take, appellant did not follow the proper rules of evidence in laying the predicate for impeachment. Since appellant was attempting to impeach Ms. Moore with her previously sworn testimony, it was incumbent upon appellant to first show her the transcript of such testimony before asking her the question: "Ms. Moore, when you testified at the habeas corpus hearing, do you remember being *Page 1094 
asked the question —." Refusing to comply with this procedure appellant was properly disallowed from continuing his attempt to impeach Ms. Moore with her prior testimony.
The trial court did not err in refusing to admit into evidence a tape recording of Ms. Moore's prior testimony at appellant's family court proceeding. Appellant contends that the tapes should have been admitted to resolve a discrepancy between the testimony of defense witness John Fox and prosecution rebuttal witness Elise Barclay. These two witnesses gave conflicting accounts of what Ms. Moore's prior testimony had been. Appellant alleged at the time he proffered the tapes that the tapes were "absolutely to the contrary" of Mrs. Barclay's testimony; however, at no time during appellant's cross-examination of Mrs. Barclay did he attempt to use the tapes to show that her recollection of the family court proceeding was incorrect. Appellant did not proffer the tapes until Mrs. Barclay had been excused from the witness stand.
The trial court, at the state's objection, refused to have the tapes admitted because they had not been properly authenticated. Appellant informed the trial court that Judge Bell from family court was the "only person who turns that tape recorder on and off," but argued that "any number of people" could authenticate the tapes. Appellant had made no effort, however, prior to the time he attempted to proffer the tapes, to procure the attendance of Judge Bell, or any other witness, for the purpose of authenticating the tapes. The trial court declined to suspend the trial to secure the attendance of Judge Bell. The trial court's rulings on this matter were correct and were within the exercise of its discretion.
Generally, sound recordings are admissible as corroborative of oral testimony. Voudrie v. State, 387 So.2d 248
(Ala.Cr.App.), cert. denied, 387 So.2d 256 (Ala. 1980) and authority cited therein. While appellant's contention is correct, that, if the parties who were present when the recording was made are available and can testify as to the statement made, the recording can be admitted as corroborative of the testimony of the witness or witnesses testifying to the statement, Voudrie, supra; Wright v. State, 38 Ala. App. 64,79 So.2d 66, cert. denied, 262 Ala. 420, 79 So.2d 74 (1954), it is still necessary that a proper foundation be laid for the admission of the sound recording. Voudrie, supra. A magnetic tape recording may be used as evidence when it is of matter otherwise legal, and provided that proper safeguards are shown to have been used so as to protect the recording against error or spoilation and the speakers recorded are properly identified and adequate safeguards are taken to insure authenticity. Fikesv. State, 263 Ala. 89, 81 So.2d 303, 311 (1955), rev'd on other grounds, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). As this court stated in Voudrie, supra:
 "The rules for testing the admissibility of recordings have been outlined as follows:
 "`(1) a showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of the authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement.' 58 A.L.R.2d at 1027-8.
 "Thus not only is a proper request necessary but a proper predicate is necessary before a sound recording can be admitted into evidence." 387 So.2d, at 256.
Clearly, then, before a tape recording can be admitted into evidence it must be authenticated. No authentication was done in this case. It is true that appellant offered to subpoena Judge Bell, but in Alabama our courts have always held it is discretionary with the trial court whether it should halt or suspend the trial to enable a party to secure or produce witnesses in court. Alonzo v. State ex rel Booth, 283 Ala. 607,219 So.2d 858 (1969). Furthermore, appellant made no showing that any other person besides Judge Bell, who was *Page 1095 
present when the recording at family court was made and was then available, could authenticate the tapes. Appellant at all times insisted that "those tapes out at Family Court are simply taken from a tape recorder on Judge Bell's desk" and "the only person who turns that tape recorder on and off will be Judge Bell." We find no abuse in the trial court's exercise of its discretion on this issue.
While Ms. Moore was a state's witness defense counsel referred to transcripts of appellant's prior family court and habeas corpus proceedings in questioning the witness on cross-examination. The prosecution requested on several occasions to be allowed to make copies of the transcripts, for the purpose of rehabilitating Ms. Moore's testimony and to verify that defense counsel's reference to the transcripts in cross-examining the witness had not been taken out of context. Appellant refused to allow the prosecution to see the transcripts claiming that the transcripts were not official and were his work product. Appellant's contentions can be summed up as follows:
 "I obtained tapes from the family court hearing and from a habeas corpus hearing where due to my diligence, my secretary — in obtaining the tapes, my secretary typed them, I have used them to prepare the trial of the case.
 "I have my own personal note underlining those things that I consider to be important. It is complete work product. The state certainly had the same access to those tapes as I did. And because they have not chosen to take advantage of that, I don't see any reason why I have to supply that for them. . . ."
Appellant maintains this argument on appeal.
The prosecution made it clear, however, that it was "not interested in any notes he made there, but some of these questions have been taken out of context, and . . ., we feel like we have the right to explain to the jury the rest of her testimony." The trial court, after much reflection, ruled that the prosecution should be allowed to see two pages of the habeas corpus transcript defense counsel had prepared to explain some of Ms. Moore's answers. There is no indication that those two pages had any of defense counsel's notes on them.
Appellant cited no case which supports his allegation that the transcripts he had prepared were a work product. We find no abuse of discretion in the trial court's ruling on this matter. Where an accused, on cross-examination of a state's witness, introduces a part of a transcript of former testimony of such witness to impeach the witness' testimony given at the present trial, it is not error to permit the state to offer the remainder of the transcript. Wilson v. State, 31 Ala. App. 21,11 So.2d 563, cert. denied, 243 Ala. 671, 11 So.2d 568 (1943);McElroy's Alabama Evidence § 159.03 (2). It is true that appellant did not formally introduce the transcripts in evidence; however, this technicality does not negate the validity of the above principle cited from Wilson. Just as inWilson, appellant in this case "introduced portions" of the state witness' former testimony for purposes of impeachment. 11 So.2d, at 566. Such "portions" of the former testimony were "introduced" as the former testimony was read in evidence as certainly as if "portions" of the actual transcript had been admitted. Furthermore, a private stenographer's transcript of testimony is admissible to prove a witness' testimony if such testimony is proper to be proved and the stenographer testifies that the transcript is correct. McElroy's Alabama Evidence § 268.02 (2) and authority cited therein. In this case Ms. White provided the necessary attestation that defense counsel's transcript was "true and accurate."
At the conclusion of Detective Jim Crumrine's testimony on cross-examination the state asked the trial court if Detective Crumrine and Detective Parker could be "released" to make the trip back to Huntsville. The following exchange then occurred:
"THE COURT: Is that all right with you?
 "MR. POLSON: Judge, it is all right, I might need — if I need them back, I would like to have them come back. *Page 1096 
"THE COURT: All right. Mr. Crumrine.
"MR. POLSON: It won't be until tomorrow though.
 "THE COURT: Yes. You are certainly excused today. They may need to call you for tomorrow.
"MR. POLSON: I don't know that I will.
 "THE COURT: All right, Well, if you will tell Mr. Parker."
Later, after the state had cross-examined appellant concerning his alibi, the defense counsel requested that Detectives Crumrine and Parker be recalled for further cross-examination. When asked his reason for recalling the two witnesses by the trial court, it became apparent that defense counsel planned to elicit hearsay testimony from the officers which would be ruled inadmissible and that he also wanted to find out whether the officers had any "exculpatory statements." The prosecution stated for the record that it had no exculpatory statements in its file, which defense counsel alleged were used by the prosecution in an attempt to impeach appellant.
Appellant argues now as he did at trial that his right to recall is "absolute." This contention is erroneous. The record in this case, as in Baxter, supra, does not support a finding that defense counsel specifically reserved a right to recall the witnesses for further cross-examination or that the court granted such a reservation. As was stated in Baxter:
 "Without question a defendant is entitled to call a witness used by the prosecution as his own. However, the defense counsel who wishes to discontinue his cross examination and reserve a remainder until a later time should make the purpose of his reservation clear to the court." 360 So.2d, at 64.
Again, we find that the trial court did not abuse its discretion on this matter. At most, any error was harmless. ARAP, Rule 45.
During defense counsel's cross-examination of Ms. Moore as a state witness, Ms. Moore denied that she had gone to Ronald's apartment the night of the murder to obtain some marijuana. Ms. Moore also testified that she did not recall making any such statement to Ms. Shelby James in the early morning hours of June 24. Ms. James later testified that Ms. Moore had told her that she had gone to someone's apartment "to get a joint of marijuana." "She didn't tell me who, she just said she went to a person over at the apartment, she didn't give any names." The following exchange then occurred during closing arguments by defense counsel:
 "MR. POLSON: And why was she going over to see Ron that night?
 "She was going to get some marijuana. Isn't that what she told Shelby James?
 "MR. NAIL: Judge, that is not in evidence. We are going to object to that, it is not in evidence.
 "THE COURT: Members of the jury, rely upon what is in evidence.
 "MR. POLSON: Well, you ladies and gentlemen heard her testify that, yes, she told me she went over to Ron's house to get some marijuana —
 "MR. NAIL: Judge, that was not evidence, I object to it, it is not in evidence, and we are objecting to him continuing to comment on it.
 "THE COURT: Members of the jury, do not rely upon that, it is not in evidence." (R. 340)
We disagree that this comment by the trial court caused reversible error. A trial court does not invade the province of the jury in a criminal prosecution by stating that there is or is not evidence of particular facts when such is the case.Seibold v. State, 287 Ala. 549, 253 So.2d 302 (1970). Here, there was no evidence from Ms. James that Ms. Moore had told her she had gone to "Ron's house" to get some marijuana. The trial court, then, correctly instructed the jury not to rely upon that statement by defense counsel, that such was not in evidence. We find no evidence from the trial court's remark that he was attempting to influence the jury one way or the other. McCovery v. State, 365 So.2d 358 (Ala.Cr.App. 1978).
We have carefully examined the state's closing argument and find no reversible *Page 1097 
error. The trial court sustained most of defense counsel's objections and further instructed the jury that "the attorneys have not done anything improper" in response to defense counsel's request for a curative instruction. An adverse ruling is a preliminary requirement to preservation of error on appellate review. Van Antwerp v. State, 358 So.2d 782
(Ala.Cr.App.), cert. denied, 358 So.2d 791 (Ala. 1978).
Finally, appellant complains that the trial court's oral charge defining legal provocation was not as full and comprehensive as it might have been. There is no merit to this argument. Where a trial court's instruction to the jury is not as full as counsel desires, his remedy is to request written charges covering the matter omitted. Smith v. State, 262 Ala. 584, 80 So.2d 307 (1955). An exception reaches only what the court did say. Grisham v. State, 147 Ala. 1, 41 So. 997 (1906).
We have carefully searched the record for errors which injuriously affected the substantial rights of the appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except DeCARLO, J., not sitting.
[1] The court reporter did make a notation in the record immediately preceding the point that Ms. Moore began to testify for appellant that she was "recalled as a witness, by the defendant . . ." However, appellant began his questions of Ms. Moore under the heading "DIRECT EXAMINATION", and not some other heading denoting continued cross examination. Likewise, the state began its questioning of Ms. Moore after appellant's "DIRECT EXAMINATION" under the heading "CROSS EXAMINATION."
[2] Although the record does not demonstrate that Ms. Moore was recalled by appellant during his case-in-chief for further cross-examination, it appears that appellant, the prosecution and the trial court were proceeding as if Ms. Moore was, in fact, still a state witness and that it was proper for appellant to "cross-examine" her and "impeach" her testimony on his redirect examination. The only apparent controversy was over the method appellant was attempting to use to lay the proper predicate for impeachment. Not once did the state complain that appellant was trying to impeach his own witness.
[3] Ms. Robbie D. White testified for the defense, after appellant had attempted to "impeach" Ms. Moore, that the transcript of the habeas corpus proceeding which was made from her shorthand notes was not complete, but was "true and accurate" of the notes she had taken. This transcript was later marked as State's Exhibit 9, but was not formally introduced into evidence. This is the same transcript appellant refused to allow Ms. Moore to see before attempting to ask her questions concerning her prior testimony at the habeas corpus proceeding.
[4] This rule should not be confused with the applicable rule for impeaching a witness' prior statements made out of court and the accompanying proper predicate which must be laid for impeachment for those situations. See McElroy's AlabamaEvidence § 157.01.