Billy Gray Williams was indicted and convicted for the capital murder of Elizabeth Dorlene Sennett in violation of Ala. Code 1975, § 13A-5-40(a)(7) ("murder done for a pecuniary or other valuable consideration or pursuant to a contract or for hire"). The circuit court accepted the jury's recommendation and sentenced the defendant Williams to life imprisonment without the possibility of parole. Williams raises three issues on this appeal from that conviction.
 I
The defendant contends that his oral and written statements to law enforcement officers should not have been admitted into evidence at his trial because (1) they were the product of an illegal arrest, (2) they were not voluntary, (3) he was not adequately advised of his constitutional rights, and (4) he did not knowingly, intelligently, *Page 1234 
and voluntarily waive his constitutional rights. Allegations (2), (3), and (4) are not supported by the facts contained in the record before this Court and do not warrant further discussion or consideration other than that the record does positively and clearly show that the defendant was properly advised of his constitutional rights on three occasions, and that the evidence overwhelmingly supports a finding that his statements were voluntarily made after a knowing, intelligent, and voluntary waiver of those rights.
The defendant's allegation that his statements were the product of an illegal arrest requires some discussion.
Mrs. Sennett was murdered on March 18, 1988. Alabama Bureau of Investigation Investigator Harold Carson testified that an anonymous informant supplied information that the defendant, Kenny Smith, and John Parker were involved in the murder of Mrs. Sennett. The informant supplied the names of these individuals, where they lived, and a description of their vehicles. The informant also provided the following information: that the defendant lived in a residence owned by Charles Sennett, the victim's husband; that the three suspects had gone to Coffee High School together and had been close friends; that the murder was originally planned for Wednesday but on that day the victim changed her mind and went to Birmingham with Mr. Sennett, who went to a doctor; that on the day of the murder the defendant purchased a waterbed at Waterworld in Florence with part of the money he was paid to kill Mrs. Sennett; that a Samsung VCR was taken from the Sennett residence and that the informant had seen that VCR in the Smith residence; and that the VCR did not have the remote control unit.
Before the defendant was taken into custody, Investigator Carson corroborated all of this information except the location of the VCR in the Smith residence. The theft of the VCR is significant in establishing the probable cause to arrest Williams because the fact of the theft had not been made public and the crime scene, the den of the Sennett residence, had been carefully preserved and isolated. This, coupled with the fact that the VCR's remote control unit had not been taken, supports the reasonable inference that the informant was credible and his information reliable. Additionally, Investigator Carson knew that Mr. Sennett, the victim's husband, had given three statements in which he denied any involvement in his wife's murder, that a number of inconsistencies had been discovered in Mr. Sennett's account of the events, that he was a suspect, and that Mr. Sennett had committed suicide on March 25, 1988. Based on the information obtained from the informant, a warrant to search the Smith residence was obtained by Colbert County Sheriff's Investigator Ronnie May early on the afternoon of March 31, 1988.
Later, on that afternoon, a "joint" decision was made by all of the officers involved in the Sennett murder investigation to arrest all three suspects and to execute the search warrant at 3:00 that afternoon. The "team" assigned to take the defendant into custody consisted of Colbert County Sheriff John Aldridge, ABI Investigator Carson, and Florence police officer Glenn Masonia. They went to the defendant's residence in Florence around 3:00 "to take him into custody and ask him to come to be interviewed." The defendant was not at home so Sheriff Aldridge and Investigator Carson returned to the Sheriff's Office in Tuscumbia. Officer Masonia was left to watch the defendant's residence and wait for his return.
Aldridge and Carson returned to the defendant's residence around 5:00 that same afternoon, having "received a call from [the] Florence Police Department that they had made contact with [the defendant] and he was with them." When Aldridge and Carson arrived, the defendant and his girlfriend, Katherine Corbin, were sitting in the defendant's car parked on the street in a location close to the defendant's residence. Officer Masonia was sitting in his police car which was parked behind the defendant's car.
At the suppression hearing, Investigator Carson testified: "We got out of our car. Mr. Williams got out. I asked him for his *Page 1235 
driver's license for identification. . . . and we asked him if he would come over, come and sit down in the car with us, we needed to talk to him [about the Sennett murder] and he agreed." Carson also testified that he and the sheriff "both got out of the car and walked up to the side where Mr. Williams was sitting." Carson testified that before the defendant got into Carson's car, Carson "just patted his pockets down to make sure he didn't have a weapon on him." Once in the car, the defendant was given his Miranda rights. Carson "asked if he would accompany us to the court-house in Tuscumbia and he said, yes and asked could he drive his car and . . . we told him we would rather he rode with us and he said let me go tell my girlfriend to follow us over there." Carson stated that he "discouraged" the defendant from driving his own car because "we wanted to make sure that he came over here." The defendant got out of Investigator Carson's car and, without any officer accompanying him, went to his car and had a conversation with his girlfriend and then "voluntarily came back and got in the car."
The defendant was taken to the courthouse. His girlfriend followed in the defendant's car. By the time Investigator Carson returned to the courthouse with the defendant, suspects Smith and Parker had already been arrested and had given statements implicating the defendant. Smith's residence had been searched and the VCR taken from the Sennett residence had been discovered.
Carson testified that before he began questioning the defendant at the courthouse, he had been informed of Smith's statement but that he "didn't know anything about what Parker had said."
The information obtained from the anonymous telephone informant and corroborated by the sheriff's department satisfies the totality-of-the-circumstances test for determining probable cause set out in Illinois v. Gates,462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
In White v. State, 550 So.2d 1074 (Ala.Cr.App.), cert. denied, 550 So.2d 1081 (Ala. 1989), cert. granted, ___ U.S. ___, 110 S.Ct. 834, 107 L.Ed.2d 830 (1990), this Court found that an anonymous telephone tip did not provide the reasonable suspicion necessary to justify a stop of a vehicle for an investigative detention. We fully recognize that "reasonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative."Florida v. Royer, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325,75 L.Ed.2d 229 (1983). However, our analysis in White is applicable here, for the difference between probable cause to arrest and reasonable suspicion to stop "may lie in the degree of probability required," 3 W. LaFave, Search and Seizure § 9.3(b) at 431 (2d ed. 1987), and the quantum of information required, id. § 9.3(e), at 478-79.
 "We begin our analysis of the instant tip with an expression of agreement with the commentator that the factors of Aguilar [v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964),] and its progeny are still 'highly relevant.' We also note that the weight of each factor cannot be set by a strict across-the-board rule, but rather depends on the totality of the circumstances of each case. However, we do declare the following two principles in determining the presence of the factors. First, corroboration of the details of the anonymous informer's tip — even innocent details — may establish the informant's veracity. See Note, Stop and Frisk Based Upon Anonymous Telephone Tips
[39 Wn. Lee L.Rev. 1437, 1450-51 (1982)]. We strongly caution, however, that the details corroborated should be impressive, as to number and specificity, under the particular circumstances, if corroboration is to be utilized to establish the tipster's credibility. This brings us to our second principle: detail in the anonymous tip can support the inference that the informant has an adequate basis of knowledge. Id. at 1449-50. However, the detail must demonstrate that the anonymous informant had special familiarity with the affairs of the suspect. 3 W. LaFave, supra, at § 9.3(e), p. 484. For an example of cases wherein a detailed tip, which proved through corroboration to be accurate *Page 1236 
in all innocent details, can furnish the reasonable suspicion necessary for a Terry stop, see White v. United States
[454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981) (White, J., dissenting)].
 "In the instant case, we find that the tip exhibits no 'indicia of reliability.' The police officers knew nothing about the informer; [Officer] Davis testified that he simply assumed that the informant was a concerned citizen. The tipster offered no information tending to show that he was a credible person. Moreover, we cannot resort to corroboration of details to find the informer to be reliable, for the details corroborated consisted of information that could have been obtained by almost anyone, and the details were not significantly corroborated. . . .
 "In regard to the tipster's basis of knowledge, we note that the tipster offered no information to suggest his source of the relayed tip. Moreover, the tip does not contain enough detail to support the inference that the informer was not relying upon mere rumor, but upon his first-hand knowledge or some other dependable manner. Most of the information is the sort readily available to the public and, thus, it is more difficult to infer that the tipster conveying this kind of information is so acquainted with the named individual that he knows of her involvement with drugs. Moreover, we know nothing of the basis of the tipster's conclusion that Vannessa White was in possession of cocaine.
 "Thus, we are confronted with a vaguely corroborated, anonymous tip consisting mostly of easily known details."
White, 550 So.2d at 1078-79.
Applying these principles to the facts of this case, we find that there existed probable cause to arrest the defendant when he was initially "taken into custody and asked to come to be interviewed."
Here, the details of the informant's tip as corroborated are sufficient both in number and specificity to establish the informant's credibility. See White, 550 So.2d at 1080. The details of the tip also support the inference that the informant had an adequate basis of knowledge, because those details indicate quite clearly that the informant either had personally observed the facts or had learned them from an actual participant in the crime. See 1 LaFave § 3.3(e) at 671-72.
Much of the information obtained from the informant was of the sort readily available to the public and thus was entitled to little weight in the probable cause determination. However, the information concerning the VCR is significant because it indicates that the informant obtained that information in a reliable manner. The fact that the VCR had been taken during the murder was discovered by the investigating officers only several days after the murder and was a fact known only by them and a few family members. The additional facts that the VCR in the Smith residence did not have with it a remote control unit and that the remote control unit to the stolen VCR was still in the Sennett residence support the inference that the informant knew what he or she was talking about. "Although it is clear that an uncorroborated anonymous tip is not sufficient to establish probable cause, nevertheless when, as in this case, the information is sufficiently detailed as to remove suspicion of rumor or revenge; and that information is verified through independent investigation; and the cumulative effect ofall information gathered meets the standard set forth in [Gates], probable cause is established." United States v.Rollins, 699 F.2d 530, 533 (11th Cir.), cert. denied,464 U.S. 933, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). See also State v.Calhoun, 502 So.2d 808, 811 (Ala. 1986)
In making our probable cause determination, we have not considered the information gained by the investigating officers as a result of the search of the Smith residence and as a result of the statements given by both Smith and Parker, because Investigator Carson and Sheriff Aldridge did not possess that information when they took the defendant into custody. We recognize the principle that " 'where a group *Page 1237 
of officers is conducting an operation and there is at least minimal communication among them, [the appropriate course is to] look to the collective knowledge of the officers in determining probable cause.' " Ex parte Boyd, 542 So.2d 1276,1284 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 219,107 L.Ed.2d 172 (1989). However, we cannot impute the information possessed by any other officers to the arresting officers in this case because it is clear that at the time the command was given to arrest the defendant, no officer was aware of the information obtained from the search and the accomplices's statements simply because those events had not yet occurred, and because it is clear that there was no communication about these matters between the officers prior to the actual arrest. 2 LaFave § 3.5(c). "Whether a warrantless arrest is constitutionally valid depends upon whether, at the moment thearrest was made, the officers had probable cause to make it."United States v. Seay, 432 F.2d 395, 400 (5th Cir. 1970), cert. denied, 401 U.S. 942, 91 S.Ct. 949, 28 L.Ed.2d 223 (1971). "In order to have a valid arrest, probable cause is required to exist before the arrest." Clifton v. State, 501 So.2d 539, 541
(Ala.Cr.App.), cert. denied, 501 So.2d 541 (Ala. 1986).
While all the evidence in this case indicates that the defendant voluntarily agreed to accompany the investigating officers for questioning, we do not justify the defendant's arrest on the basis of his consent, because the record does not show what occurred before Sheriff Aldridge and Investigator Carson arrived to take the defendant into custody. Cf.Bradley v. State, 494 So.2d 750, 757-59 (Ala.Cr.App. 1985), affirmed, 494 So.2d 772 (Ala. 1986). We do not know whether Officer Masonia stopped or detained the defendant or whether the defendant consented to wait for the arrival of Sheriff Aldridge and Investigator Carson. "[W]hen a police officer arrests without a warrant, and the defendant objects to the introduction of evidence seized as an incident to the arrest, 'the burden is on the State to show that the arrest was lawful' pursuant to § 15-10-3." Ex parte Brownlee, 535 So.2d 218, 219
(Ala. 1988).
 II
The defendant argues that he was entitled to a change of venue because of prejudicial pretrial publicity and community atmosphere which precluded the selection of an impartial jury. The defendant contends that the prejudicial publicity was heightened by the fact that Mrs. Sennett, the victim, was the wife of a prominent minister and pastor of the Westside Church of Christ in Sheffield; by the brutal and horrifying manner in which Mrs. Sennett was beaten and stabbed to death; and by the subsequent suicide of Mr. Sennett.
The defendant was tried in January 1989 — nearly one year after the crime was committed in March 1988. Most of the radio, television, and newspaper reports of the crime occurred in March and April of 1988.
The voir dire of the jury venire was extensive. Of the venire, only 16 members indicated that they had heard about the case. Eight of those stated that the publicity had affected their opinion and all eight were struck for cause.
 "Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353
(Ala.Crim.App. 1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Crim.App. 1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751
(1961):
 " 'To hold that the mere existence of any preconceived notion as to the guilt *Page 1238 
or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. . . .'
 "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589
(1975). Thus, '[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App. 1978)."
Ex parte Grayson, 479 So.2d 76, 80 (Ala. 1985), cert. denied,474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1986).
Applying these principles to the facts of this case, we find nothing to show that the trial judge abused his discretion in denying the motion for change of venue.
 III
In sentencing the defendant, the trial judge entered written findings of fact summarizing the crime and the defendant's participation in it in accordance with Ala. Code 1975, §13A-5-47(d). The trial judge found that, in early March of 1988, the 21-year-old defendant agreed with Charles Sennett, the husband of the victim, "to hire Kenneth Eugene Smith, and through said Smith, John Forrest Parker to kill Elizabeth Dorlene Sennett." The defendant, Smith, and Parker each received $1,000 for the killing. There is evidence that the defendant actively promoted and encouraged Smith and Parker, although the defendant was not present during the actual stabbing and beating of Mrs. Sennett.
The findings of the trial judge are amply supported by the evidence, and the issue of the defendant's guilt or innocence was properly presented to the jury.
 "This Court must review the evidence presented by the State in its most favorable light when deciding the sufficiency of the evidence. Walker v. State, 416 So.2d 1083 (Ala.Crim.App. 1982). A verdict of conviction will not be set aside on an assertion of insufficiency of the evidence unless, considering all reasonable presumptions of correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the Court that it was wrong and unjust. Johnson v. State, 378 So.2d 1164
(Ala.Crim.App.) cert. quashed, 378 So.2d 1173 (Ala. 1979). The test applied in this situation is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis but guilt. See Dolvin v. State, 391 So.2d 133 (Ala. 1980)."
Ex parte Cunningham, 548 So.2d 1049, 1050 (Ala. 1989). See alsoEx parte Hinton, 548 So.2d 562, 568 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.