[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 20, 2009
THOMAS K. KAHN
CLERK

_____

No. 05-16907

_____

D. C. Docket No. 00-01846-CV-SLB-PWG

JOHN FORREST PARKER,

Petitioner-Appellant,

versus

RICHARD F. ALLEN,
Commissioner, Alabama Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(April 20, 2009)

Before EDMONDSON, Chief Judge, BIRCH and BLACK, Circuit Judges.

BIRCH, Circuit Judge:

Petitioner-appellant John Forrest Parker appeals the district court's judgment

dismissing his petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254

and denying him relief.  Parker sought a vacation of his 1988 conviction for capital

murder and his death sentence.  After the district court denied Parker's Fed. R. Civ.

P. 59 motion for reconsideration, Parker appealed and the district court issued a

certificate of appealability on five issues.  We conclude that the district court

correctly denied habeas relief and AFFIRM.

## I.  BACKGROUND

In March 1988, Charles Sennett contracted with one of his tenants, Billy

Gray Williams, to murder his wife, Elizabeth Dorlene Sennett  ("Dorlene"), for

$3000.  Parker v. State, 587 So. 2d 1072, 1078 (Ala. Crim. App. 1991) ("Parker

I").[1]  Williams, in turn, hired John Parker and Kenneth Eugene Smith for $1000

each to commit the murder.  Williams gave Parker $100 to purchase a weapon on

17 March 1988, and promised to pay him the balance when the job was completed.

Instead of buying a weapon, Parker used the $100 for drugs and injected 3 cubic

centimeters of Talwin, a narcotic analgesic (painkiller), while en route to the

Sennetts' residence on 18 March.  Parker drove his vehicle to the Sennetts'

residence while Smith, who was in the passenger seat, sharpened Parker's survival

---

[1]  The record in this case consists of the district court filings and the state court filings, which were filed in this record as an exhibit to R1-17.  The state court filings are compiled in two sets of volumes, supplements and other documents.  Volumes 1-14 are the record from Parker's direct appeal; the volumes from these are designated in this opinion as "Vol."  Volumes 1-16 are the record from Parker's post-conviction proceedings; these volumes are designated in this opinion as "PC Vol."  Citations to the state court exhibits will be hereafter indicated as "Exh. Vol." and "Exh. PC Vol."

knife. Parker parked his car behind the Sennetts' home, told Dorlene that her husband had given them permission to look at the property as a hunting site and, upon receiving Dorlene's approval, walked into a wooded area with Smith. They later returned to the house and received permission from Dorlene to use her bathroom. While in the bathroom, Parker put cotton socks onto his hands. He then exited the bathroom, jumped Dorlene, and began hitting her. Parker and Smith hit Dorlene with a galvanized pipe and stabbed her while she pled with them not to hurt her. Consistent with their plan, they broke the glass in the medicine cabinet and took a stereo and video cassette recorder (VCR) to make the assault look like it was done during a burglary. Parker later burned his clothes and threw the stereo off a bridge, and he and Smith threw away the knife that they used. Parker subsequently received the additional $900 for the murder. Parker v. State, 610 So. 2d 1171, App. II at 1178-79  (Ala. Crim. App. 1992) ("Parker II); In re Parker, 610 So. 2d 1181, 1184-85 (Ala. 1992) ("Parker III").

When Sennett arrived home, he found his house ransacked and Dorlene close to death, and called Colbert County Sheriff's Investigator Ronnie May at 11:44 A.M. May dispatched a rescue squad and sheriff's deputies to the Sennetts' home. May and another deputy arrived at the Sennetts' home about 12:05 P.M., and the rescue squad arrived soon thereafter. Dorlene was transported to the

3

hospital, and seen by Dr. David Parks McKinley. Resuscitation efforts failed and

Dorlene was declared dead as a result of cardiac arrest and exsanguination. An

examination of her body revealed multiple stab wounds to the right side of her

chest, the right side of her neck, the base of her neck, forehead, nose, and scalp,

and contusions on her nose and forehead. Hairs found at the crime scene in a cap

located near Dorlene's body were consistent with Smith's known hair sample, and

on an afghan that had been wrapped around Dorlene's body were consistent with

fibers later taken from Parker's knife. Parker I, 587 So. 2d at 1089. The VCR

taken from the Sennetts' house was found inside Smith's residence. Parker I, 587

So. 2d at 1090.

In April 1988, Parker was indicted for the capital murder of Dorlene by

beating and stabbing her with a knife for the pecuniary consideration of $1000 in

violation Ala. Code 13A-5-40.[2] At trial, he was found guilty by a jury; the jury

recommended a sentence of life imprisonment without parole. The sentencing

---

[2] The offense of capital murder includes "Murder done for a pecuniary or other valuable consideration or pursuant to a contract or for hire." Ala. Code § 13A-5-40.

Charles Sennett, a Church of Christ minister, committed suicide on 25 March 1988, seven days after Dorlene died. Parker I, 587 So. 2d at 1078. Williams was convicted of capital murder and sentenced to life imprisonment without the possibility of parole. Williams v. State, 565 So. 2d 1233 (Ala. Crim. App.), cert. denied (Ala. 1990) (No. 89-1184). Smith was convicted of capital murder and sentenced to death. Smith v. State, 908 So. 2d 273 (Ala. Crim. App. 2000), cert. denied, 546 U.S. 928, 126 S. Ct. 148 (2005).

judge, however, overrode the jury and sentenced Parker to death on 21 June 1989.[3]

See Parker I, 587 So. 2d at 1076, 1100. On appeal, the case was remanded for an

evidentiary hearing on Parker's Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712

(1986) claim and for the district court to reweigh and make new findings regarding

the mitigating and aggravating circumstances.[4] Parker I, 587 So. 2d at 1100.

Following an evidentiary hearing on remand, the trial judge found that the

prosecution had not violated Batson by using its peremptory strikes to remove

eight black venire members. Parker II, 610 So. 2d at 1172, 1177. The trial judge

also found that the aggravating circumstance of murder for pecuniary gain

outweighed the mitigating circumstances, including Parker's lack of a prior

significant criminal history, age at the time of the offense, demonstration of

remorse, and the jury's recommendation of life without parole. Id. at 1172, 1179-

81. Parker's conviction and sentence were affirmed by the appellate court and the

Alabama Supreme Court. See id. at 1173; In re Parker, 610 So. 2d 1181, 1187

---

[3] Under Ala. Code § 13A-5-47(e), the jury's sentencing recommendation is to be given consideration but "is not binding upon the court."

[4] On appeal, Parker raised twenty-four issues, including: (1) the prosecutor's use of his peremptory strikes in violation of Batson; (2) the prosecutor's failure to disclose a witness's other convictions and the favorable treatment he received in exchange for his testimony in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); (3) the illegality of the warrantless search of his home; (4) the involuntariness of his post-arrest statement; (5) improper prosecutorial closing arguments; and (6) his court-appointed counsel's lack of required experience. Parker I, 587 So. 2d at 1076, 1078, 1082-85, l087-93, 1095-98, 1100.

(1992) ("Parker III").  Parker's petition for writ of certiorari was denied.  See

Parker v. Alabama, 509 U.S. 929, 113 S. Ct. 3053 (1993) ("Parker IV").

Parker moved for post-conviction relief under Alabama Rule of Criminal

Procedure 32 in 1994, and filed an amended petition in 1996.[5]  Following an

evidentiary hearing, the state trial court denied the petition.  The denial was

affirmed on appeal, Parker v. State, 768 So. 2d 1020 (Ala. Crim. App. 1999)

("Parker V"), and Parker's petition for writ of certiorari was denied, Ex Parte

Parker, 780 So. 2d 811 (Ala. 1999) ("Parker VI").

Parker filed a timely petition for writ of habeas corpus, pursuant to 28

U.S.C. § 2254, in 2000 and amended the petition in 2001.[6]  The district court

---

[5]  In his initial and amended Rule 32 petitions, Parker raised the eighteen issues, including: (1) ineffective assistance of counsel during the pretrial investigation and proceedings, jury selection, trial, post-trial motions, sentencing, and on appeal; (2) the inadmissibility of Parker's statements made during and after his arrest; (3) unconstitutionality of Parker's statements taken while he was under the influence of alcohol and drugs; (4) the trial court's failure to suppress Parker's statements and to allow their admission as trial evidence; (5) the trial court's erroneous rulings on his objections during the suppression hearing and the trial; and (6) prosecutorial misconduct.

[6]  In both his original and amended habeas petitions, Parker raised the following issues: (1) unconstitutional exclusion of jurors on the basis of race and gender in violation of Batson; (2) improper prosecutorial closing argument; (3) trial court's erroneous jury instruction on reasonable doubt; (4) prosecutor's Brady violation concerning a witness; (5) ineffective assistance of trial counsel during the suppression hearing, pretrial investigation, jury selection, trial, closing argument, jury charge, sentencing phase, and in their motions to withdraw; (6) denial of due process because of medication; (7) trial court's failure to strike prejudiced jurors; (8) trial court's override of the jury verdict; (9) trial court's admission of Parker's statement made at the time of his illegal arrest; (10) trial court's denial of Parker's motion for change of venue; (11) trial court's failure to recuse; (12) trial court's unconstitutional admission of Parker's statement; (13) trial court's failure to instruct on lesser included offenses including intentional and reckless murder; and (14) trial court's unconstitutional testimony.  In his

6

denied the petition and denied reconsideration. Following Parker's notice of appeal, the district court granted a certificate of appealability on the following issues: (1) whether jurors were excluded by the prosecutor on the basis of race, contrary to clearly established federal law and in violation of the Sixth, Eighth, and Fourteenth Amendments; (2) whether the prosecutor's improper closing arguments denied Parker due process, a fair trial, and a reliable sentencing proceeding in violation of the Sixth, Eighth and Fourteenth Amendments; (3) whether the state's failure to disclose information relevant to a witness's testimony was a violation of Brady and the Sixth, Eighth, and Fourteenth Amendments; (4) whether Parker received ineffective assistance of counsel at trial in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments; and (5) whether Parker's statement and other evidence were obtained in violation of the Fourth Amendment.

## II.  DISCUSSION

We review the denial of a petition for writ of habeas corpus de novo, but are limited in our review of every issue decided in the state courts by a "'general framework of substantial deference.'" Crowe v. Hall, 490 F.3d 840, 844 (11th Cir.

---

amended petition, Parker raised the following additional issues: (15) the trial court erred on remand for sentencing by failing to provide Parker with an opportunity to present evidence, argue, or speak; (16) his arrest was illegal based on the officers' lack of jurisdiction; (17) his statements were the result of illegal and unconstitutional duress; and (18) the indicting grand jury was selected in a discriminatory and unconstitutional manner.

7

2007) (quoting Diaz v. Sec'y of the Dep't of Corr., 402 F.3d 1136, 1141 (11th Cir. 2005)). We will not, therefore, disturb the decisions of the Alabama courts unless those decisions are "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or were "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d).

Under § 2254(d)(1), a state court decision is "contrary to" clearly established federal law if the state court either (1) applied a rule that contradicts the governing law as set forth by the Supreme Court or (2) arrived at a different result from the Supreme Court when presented with "materially indistinguishable facts." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). A state court decision involves an "unreasonable application" of clearly established Supreme Court law if the law is "applied . . . to the facts . . . in an objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25, 123 S. Ct. 357, 360 (2002).

A. Juror Exclusion Based on Race

Parker argues that, over his objection, the prosecution struck eight of nine qualified black venire members. He contends that the trial court's finding on remand that the prosecutor struck the jurors on facially-neutral grounds is not supported by the record because eight of the seated jurors had exactly the same characteristics that the prosecution identified as the bases for excluding four black

8

venire members. He contends that the prosecution's explanations for striking the venire members and for failing to strike other similarly situated white venire members are inconsistent with its failure to question the white venire members about their traffic violations and personal and family criminal histories.

The prosecution exercised peremptory strikes against eight of the nine black venire members. The stricken black venire members included Juror 3, Sheila Armstead; Juror 21, Thykle L. Coman; Juror 25, Jeffrey S. Davis; Juror 67, Willie M. Mayes; Juror 77, Cynthia Montgomery; Juror 83, Annie O. Owes; Juror 120, Eugene L. Watkins; and Juror 121, Mary A. Webb. Black venire member Carter Triplett, Juror 113, was selected for the jury.

During voir dire, none of the black jurors responded positively when asked whether they believed that the death penalty should be applied in the case of a murder. The prosecution then used 26 of its 28 strikes to strike individuals who did not answer favorably toward the death penalty. The reasons provided by the prosecution for exercising these strikes included (1) Coman's general opposition to the death penalty;[7] (2) the belief that Coman[8] and Webb,[9] who had taken

---

[7] Coman indicated that she was opposed to the death penalty under any circumstance and would always prefer a sentence of life without parole to death.

[8] Coman also knew Sennett's girlfriend and possible defense witness, Doris Tidwell.

[9] Webb had taken a psychology course during college.

9

psychology classes or training, would give "undue emphasis" to a defense psychologist's testimony, R1-17, Exh. Vol. 3 at 402-04; (3) the belief that Armstead,[10] Coman,[11] Montgomery,[12] and Owes,[13] who each were related to someone who had been charged with a crime, might be "prejudice[d] against the State," Exh. Evid. HR at id. at 17-18, 20-24, 32-36, 38-40; and (4) the belief that Watkins,[14] who had a "series of traffic offenses" and "arrests," might think "that the State . . . [was] picking on him," "not be open minded . . . to the testimony of law enforcement officers," and have an inability "to follow the law." Id. at 24-25, 40-41. Davis indicated that, if the jury was sequestered, he would have problems staying overnight.[15] Mayes worked with members of co-defendant Williams' family and had overheard conversations regarding the case. [Id. at 21-22.]

---

[10] Armstead's mother, Elsie Armstead, was under prosecution in Colbert County for theft of property.

[11] Coman's relative, Robert Coman, had a drug conviction in Colbert County.

[12] Montgomery's cousins were prosecuted on drug charges "factually related" to Parker's case. The prosecutor also thought that Montgomery had an out-of-wedlock child and might be sympathetic to Parker, who also had an out-of-wedlock child.

[13] Owe's brother-in-law, Williams Owes, had a Colbert County arrest warrant pending for a drug charge at the time of the trial. Owes's husband, Thomas Owes, was a defendant in a civil forfeiture case filed by Alabama and the prosecution believed that this would prejudice her against them. She also knew defense attorney Gene Hamby.

[14] Although the prosecution conceded that Watkins's five traffic offenses were "minor" and insufficient to justify a strike, they argued that the offenses indicated a pattern. The prosecutor did not strike anyone with a single speeding offense.

[15] Davis said that he did not want to serve on the jury.

White venire members were stricken for some of the same reasons. Juror 92, Betty Rickard, was stricken for her general opposition to the death penalty; Jurors 9, Rebecca Barr; 58, Sharon Landers; 63, Rebecca Livingston; 82, Marshal Newman; Rickard; and 129, Marty Willingham, were stricken because they had prior training or course-work in psychology; and Willingham had a record of minor traffic offenses. Jurors 40, Pamela Hendon; 53, Jenaine Johnson; and Jennifer Razor said that it would be difficult for them to stay overnight. Juror 68, Birdie McCarley was stricken because she knew members of Parker's family.

Eight of the eleven white seated jurors were, however, related to someone who had been convicted of a felony, had taken a psychology course, knew one of the defense attorneys, or had been convicted of more than one traffic offense. Seated white juror Joni Simpson admitted that she had taken a course in psychology. The prosecutor admitted that he erred in not striking Simpson because he intended to strike all of the venire members who had taken psychology classes and his note indicated that he had. Simpson and seated juror Gary Highfield knew defense attorney, Gene Hamby, and seated juror Teddy Roe Mansell knew defense attorney H. Thomas Heflin, Jr.'s law partner, who had represented Mansell's ex-wife during child support contempt proceedings. Seated jurors Highfield,[16]

---

[16] Highfield said that, at the time of the trial, he had at least two speeding convictions.

Mansell,[17] Mike Quillen,[18] Williams Glenn Pettus,[19] Simpson,[20] and alternate juror Johnny O. Miller, all had traffic offense records.[21] Many of the seated jurors' traffic offenses occurred outside of Colbert County, and Quillen's traffic offenses occurred in Tennessee. Highfield, Mansell, Pettus and Simpson had only one traffic ticket each from Colbert County. Mansell had been prosecuted for child support contempt proceedings. Seated jurors James Ayers, Highfield, LaDecca Holt, Lucy Lowry, Noel Gene Morris, and Quillen were related to someone who had a felony conviction. The convictions of the family members of Ayers, Lowry, and Morris were outside of the five year scope of the prosecutor's investigation.[22] The convictions of the family members of Highfield, Lowry, Morris, and Quillen occurred outside of Colbert County, Alabama.[23] LeDecca Holt's "uncle by

---

[17] At the time of the trial, Mansell had two speeding convictions.

[18] Quillen only remembered having had one traffic ticket before the trial.

[19] Pettus had at least two prior tickets for driving while intoxicated.

[20] Simpson testified that, at the time of the trial, she had received three speeding tickets and one reckless driving ticket.

[21] White venire members Wiley K. Arnold, Beyersdorf, Freeman, Goskey, and Murphrey had traffic offense records but were excused.

[22] Ayers' uncle's conviction occurred at least 12 years earlier, Lowry's uncle's conviction about 9 years earlier, and Morris's brother's conviction about 25 years earlier.

[23] Highfield's relative's conviction was in Madison County, Alabama; Lowry's uncle's conviction was in Florida; Morris's brother's conviction was in Lawrence County, Alabama; and Quillen's cousin's conviction was in Franklin County, Alabama.

12

marriage," Curtis Sheffield, had a felony conviction in Colbert County.[24]  Exh. Evid. HR at 64.

The prosecution used 28 percent of its total strikes to strike black venire members, who composed about seven percent of the total venire and eight percent of the seated jury.  Acknowledging that black jurors were struck, the prosecution argued that "race had nothing to do" with the strikes because they were not "paying attention to race."  Id.  at 27.  During its first twelve strikes, the prosecution used eight strikes against blacks.  In making the strikes, the prosecution relied on information regarding repeat traffic violations and criminal prosecutions of the jurors or their families that its investigator had obtained and did not question the jurors if that information indicated a potential problem that might lead to bias.  The investigator's search spanned five years, which was the amount of time that the prosecuting district attorney had been in office and that the records were retained in the county clerk's office.  Traffic investigations were performed on any venire members who were "thought" to have a history of traffic offenses based on the prosecution's investigator's interviews with law enforcement officers.  Id. at 41. The prosecutor explained that he did not question the venire members regarding information that he had obtained from their individual voir dire questionnaires or

_____

[24]  The record does not indicate when Sheffield's conviction occurred.

13

his investigator because he did not want to embarrass them in front of the other venire members. He acknowledged that, although individual voir dires were available, he did not use them. He said that he had no knowledge of Holt's family member's crime and "missed" it during the investigation. Id. at 90.

On direct appeal, the state appellate court affirmed the trial judge's "commendable thoroughness and . . . conscientiousness" in making findings and concluding that Batson was not violated. Parker II, 610 So. 2d at 1172. The state trial court compared each of the reasons for the prosecutor's strikes, noted the prosecution's practice regarding its investigatory methods, and commented that, even if the prosecution had done a state-wide investigation of the venire members' traffic records, it would only have been able to get records for five years. Id. at 1173-76. Based on the analysis of the strikes and investigatory methods, the trial court "d[id] not find that there was a significant disparate treatment of [the venire-members] with the same characteristics." Id. at 1176.

The district court found that the prosecution's failure to strike the white jurors with traffic convictions or family member convictions that occurred outside of Colbert County or more than five years earlier was not inconsistent with its striking of black jurors who had traffic convictions and family member convictions that occurred within Colbert County within the last five years. It found that the

14

trial court's conclusion satisfied <u>Batson</u> and that its decision was neither contrary to nor involved an unreasonable application of the law.

Because it is constitutionally permissible for the prosecutor to retain jurors who are "death qualified" and to strike jurors who state that they could not impose the death penalty under any circumstance, <u>Lockhart v. McCree</u>, 476 U.S. 162, 165-67, 175-77, 106 S. Ct. 1758, 1760-62, 1766-67 (1986), the prosecution legitimately struck Coman.

In <u>Batson</u>, the Supreme Court held it unconstitutional for the prosecution to challenge potential jurors based solely on their race or on the assumption that because of their race they will be unable to consider the case impartially. 476 U.S. at 89, 106 S. Ct. at 1719. A defendant may raise the necessary inference of "purposeful discrimination in selection of the petit jury" based "solely on evidence concerning the prosecutor's exercise of peremptory challenges" during the trial. <u>Id.</u> at 96, 106 S. Ct. at 1723.

> [T]he defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the [undisputed] fact . . . that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

15

Id., 106 S. Ct. at 1723 (internal citations and quotation marks omitted). It is not necessary to show that all or even a majority of the prosecutor's strikes were discriminatory; any single strike demonstrated to result from purposeful discrimination is sufficient. See McNair v. Campbell, 416 F.3d 1291, 1311 (11th Cir. 2005). In Powers v. Ohio, 499 U.S. 400, 402, 111 S. Ct. 1364, 1366 (1991), Batson claims were extended to defendants regardless of whether they share the same race as the struck jurors.

Once the defendant makes a prima facie showing, the burden shifts to the prosecution to explain, in clearly and reasonably specific terms, the legitimate race-neutral reasons for striking the jurors in question. Batson, 476 U.S. at 97, 98 n.20, 106 S. Ct. at 1723, 1724 n.20. The court must then confront the "decisive question" and evaluate the credibility of the prosecution's explanation, Hernandez v. New York, 500 U.S. 352, 365, 111 S. Ct. 1859, 1869 (1991), "in light of all evidence with a bearing on it." Miller-El v. Dretke, 545 U.S. 231, 252, 125 S. Ct. 2317, 2331 (2005). Finally, the court must determine whether the defendant has established purposeful discrimination. Batson, 476 U.S. at 98, 106 S. Ct. at 1724.

The reasons stated by the prosecutor provide the only reasons on which the prosecutor's credibility is to be judged. United States v. Houston, 456 F.3d 1328, 1335 (11th Cir. 2006). The credibility of the prosecution's explanation is to be

16

evaluated considering the "totality of the relevant facts," including whether members of a race were disproportionately excluded. Hernandez, 500 U.S. at 363, 111 S. Ct. at 1868 (quotation marks and citation omitted). Questions arise regarding the credibility of the explanation and the possibility that the explanation is pretextual (1) when the prosecutor's explanation for a strike is equally applicable to jurors of a different race who have not been stricken, Caldwell v. Maloney, 159 F.3d 639, 651 (1st Cir. 1998); (2) upon a comparative analysis of the jurors struck and those who remained, Turner v. Marshall, 121 F.3d 1248, 1251-52 (9th Cir. 1997), including the attributes of the white and black venire members, Houston, 456 F.3d at 1338; (3) or when the prosecution fails to engage in a meaningful voir dire examination on a subject that it alleges it is concerned, Miller-El, 545 U.S. at 246, 125 S. Ct. at 2328. Evidence of purposeful discrimination may be shown through side-by-side comparisons confirming that the reasons for striking a black panelist also apply to similar non-black panelists who were permitted to serve. See id. at 241, 125 S. Ct. at 2325. A prosecutor's reasonable explanation for objecting to a black panelist based on his or her opinions or comments may be undercut by the prosecution's failure to object to other white panelists who expressed similar views, and may be evidence of pretext. Id. at 248, 125 S. Ct. at 2329-30. The prosecutor's failure to strike similarly situated jurors is not pretextual, however,

17

"where there are relevant differences between the struck jurors and the comparator jurors." United States v. Novaton, 271 F.3d 968, 1004 (11th Cir. 2001). The prosecutor's explanation "does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices." Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct. 969, 973-74 (2006) (quotation marks and citation omitted). Neither a prosecutor's mistaken belief about a juror nor failure to ask a voir dire question provides "clear and convincing" evidence of pretext. McNair, 416 F.3d at 1311-12.

If the fact-finder determines that the prosecutor's race-neutral explanations are true, the petitioner may obtain relief only by showing that the state court's conclusion was an unreasonable determination of the facts in light of the evidence presented during the state proceedings. Miller El, 545 U.S. at 240, 125 S. Ct. at 2325. Consistent with § 2254(e)(1), we presume the state court's factual findings to be correct unless the petitioner rebuts that presumption with clear and convincing evidence. Id. "The standard is demanding but not insatiable; . . . deference does not by definition preclude relief." Id. (citation and internal punctuation omitted). We cannot, however, substitute our evaluation of the record for that of the state trial court, as we presume the state court's factual findings to be correct, and cannot grant a habeas petition unless the state court's credibility

18

findings regarding the prosecutor's race-neutral explanations for the Batson

challenge are "unreasonable . . . in light of the evidence presented in the state

court." Rice, 546 U.S. at 337-39, 126 S. Ct. at 973-74.

Based on the Alabama Court of Criminal Appeals' remand for the

prosecution to offer race-neutral reasons for striking the jurors, we assume that a

prima facie showing under Batson was made. See Parker I, 587 So. 2d at 1077;

Novaton, 271 F.3d at 1003 (assuming a prima facie showing when the district court

required the prosecution to offer race-neutral reasons for its strikes).

Based on the state court's application of the law, acceptance of the

prosecutor's stated reasons for his strikes, and consideration of the differences in

the situations of the stricken and seated jurors, the district court did not err in

finding that the state court reasonably applied Batson and that Parker failed to

prove "purposeful discrimination" under Batson.

B. Improper Closing Arguments

Parker argues that the Alabama Court of Criminal Appeals' decision

regarding the prosecutor's vouching for witnesses during the guilt-phase closing

argument and arguing that the death penalty should be applied because of

uncharged criminal behavior is an unreasonable application of the law and an

unreasonable application of the facts. Alabama concedes that the prosecutor's

arguments regarding two of the witnesses were improper, but maintains that the other statements were not improper and that none of the statements rise to the level of a violation of due process.

During the guilt-phase closing argument, the prosecutor summarized the evidence against Parker and commented about the testimony of three of Alabama's witnesses, Donald Buckman, Investigator May, and Dr. McKinley. Regarding Buckman's testimony, the prosecutor "assure[d]" the jury that Buckman "did not have anything against John Parker." Exh. Vol. 8 at 1576. Regarding May's testimony, the prosecutor stated:

> I've known Ronnie May for a long time and worked with him and, of course, when we put a witness on the witness stand we vouch for their credibility just as the defense does when they call a witness. But I can assure you right now that what Ronnie May testified to you about –about anything, but particularly about the statement that I'm, talking about right now that was given to him on March the 31st by Mr. Parker. I can assure you he told you the truth, what was told him by Mr. Parker. And I don't for any one minute think that any of y'all think he would get up and make it up or fabricate it or anything like that. But I can assure you, ladies and gentlemen, what he told you is the truth with regard to that statement.

Id. at 1575. Regarding McKinley, the prosecutor asked the jury to consider:

> Who is best qualified to make the judgment about the potential murder weapon? . . . [T]he forensic pathologist who did the autopsy who made exacting measurements about the wounds and examined those wounds? Whose job it was to determine specifically what the cause of death was and to determine, if possible, what type of weapon might have been used and some possible characteristics for that

20

weapon? . . . [O]r is it the doctor who worked on the person in the emergency room and was primarily trying to save her life. . . . I'm not try[ing] to in anyway run down Dr. McKinley. I know Dr. McKinley. He's a personal acquaintance of mine and I can assure he's . . . giving you his opinion, his best opinion, but again I say to you; who is best qualified to give that opinion?

Id. at 1581-82.

In his final closing argument, the prosecutor explained to the jury that they

were "the most important part of this whole case" because their function was to

listen to the evidence and decide what the truth is. You decide who that has testified to you is telling the truth, who is not telling the truth, who is being evasive with you and you ultimately decide the true facts in the case upon which your verdict is to be based . . . .

Exh. Vol. 9 at 1608.

The prosecutor, however, then continued:

There is no such thing as a case that you couldn't look at long enough and hard enough and find some kind of little inconsistency in the testimony and the reason for that is, I submit to you at least from the State's witnesses they were trying very hard to tell you the truth and the truth as they saw it. . . . [W]e vouch for the credibility of those witnesses by putting them on the stand and I submit to you that they've told the truth . . . .

Id. at 1611.

During the jury instructions, the trial judge instructed the jury

that they were:

the sole judges as to the weight that should be give to all of the testimony in the case . . . [t]he jury's role is to determine the facts.

21

You ladies and gentlemen of the jury[] take the testimony of the witnesses, together with all proper and reasonable inferences therefrom, apply your common sense, and in an impartial and honest way[,] determine what you believe to be the truth. You should weigh all of the evidence and . . . give it just such weight as you think it is entitled to receive. In doing so[,] you may take into consideration any interest which any witness might have shown to have in the outcome of this case.

If you believe that any material part of the evidence of any witness was willfully false, you may disregard all of the testimony of such witness.

Id. at 1655-56.

In determining what the true facts are in the case, you are limited to the evidence that has been presented from the witness stand as opposed to matters that have been stated by the attorneys in the course of the trial. What the attorneys have said . . . is not evidence in the case. What they have argued to you . . . is not evidence.

Id. at 1641-42.

The Alabama Court of Criminal Appeals found that the prosecutor's statements were "improper attempts to bolster witnesses by vouching for their credibility." Parker I, 587 So. 2d at 1094. It concluded, however, that the comments, "although clearly erroneous, do not undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." Id. (citation and internal quotations omitted). In reaching that conclusion, it viewed the prosecutor's comments in the context of the entire trial and noted that (1) during the defense closing argument, Parker's attorney did not contend that Parker's confession was

22

false, but conceded that Parker admitted that he was at the crime scene and had gone there to commit a burglary, and (2) any prejudice was cured by the trial judge's extensive cautionary instructions to the jury that they were only to consider the evidence and not the attorneys' comments. Id. at 1094-95.

During a trial, counsel have a duty to refrain from commenting on their personal views on a defendant's guilt and the evidence. United States v. Young, 470 U.S. 1, 7, 9, 105 S. Ct. 1038, 1042-43 (1985). A prosecutor's comments during a closing argument are evaluated to determine whether the comments so unfairly affected the trial as to deny the defendant due process, Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2474-71 (1986), when considered "in the context of the entire trial in light of any curative instructions." United States v. Abraham, 386 F.3d 1033, 1036 (11th Cir. 2004) (per curiam) (quotation marks and citation omitted). Due process is denied "when there is a reasonable probability," or "a probability sufficient to undermine confidence in the outcome," that, but for the improper remarks, "the outcome of the proceeding would have been different." United States v. Eyster, 948 F.2d 1196, 1206-07 (11th Cir. 1991) (citations and internal punctuation omitted). The prosecutor's comments must both (1) be improper and (2) "prejudicially affect the substantial rights of the defendant." United States v. Thompson, 422 F.3d 1285, 1297 (11th Cir. 2005). A

23

prosecutor's comments constitute improper "vouching" if they are "based on the government's reputation or allude to evidence not formally before the jury." Eyster, 948 F.2d at 1206. Although improper vouching is grounds for reversal, it may be cured if the remarks are not "substantially prejudicial" and any lingering prejudice is remedied by a careful cautionary instruction. United States v. Sarmiento, 744 F.2d 755, 762-65 (11th Cir. 1984).

As the Supreme Court of Alabama correctly noted, Parker's strategy was to argue that he assaulted but did not murder Dorlene. Parker III, 610 So. 2d at 1184. During his closing arguments, Parker's attorney used Parker's statement to support that strategy. He was thus not prejudiced by any enhanced credibility given to the testimony of Buckman or May since their testimony that Parker had gone to the Sennetts' residence was consistent with this strategy and would not have adversely affected the jury verdict. He was also not prejudiced by the prosecutor's reference to his personal acquaintance with McKinley; the prosecutor based his comments on a comparison of McKinley's and the forensic pathologist's qualifications regarding their thoughts on the murder weapon and was based on facts in evidence. Further, any enhanced credibility given to McKinley's testimony was consistent with Parker's witness's testimony that he did not believe that Parker's knife was the murder weapon.

24

Buckman testified that Parker and Smith drove to his house in Parker's car on the morning of the murder and that Smith asked where he could find a gun. May testified that Parker admitted in his statement that, on the day of the murder, he and Smith drove to the Sennetts' home in his car, jumped Dorlene, held her down with a chair, and hit her with a galvanized pipe; Smith did all of the stabbing; and they stole the Sennetts' VCR and stereo and broke some glassware to provide the appearance of a robbery. May also testified that Parker did not know who covered Dorlene, did not know the number of times she was stabbed or the location of the wounds, never stated that she was dead when they left, and denied turning over a china cabinet that the police found turned over in the room where Dorlene was found.

McKinley, Dorlene's emergency room physician, did not think Parker's knife was the instrument that caused her injuries based on his examinations of Dorlene's knife wounds, the knife, and the autopsy photographs and report. He admitted that he had not measured the depth of the wounds but noted that he determined that the wounds extended "from the skin all the way into the chest cavity" or at least two inches or more. Exh. Vol. 6 at 1056-57. He also explained that, although the knife had a serrated edge, he did not observe any "sawing effect" on the wounds, which were described in the autopsy report as having a "sharp" and

25

"fairly smooth rounded edge." Id. at 1059. He conceded that the forensic pathologist who performed the autopsy had more specialized training and would have probably made more specific detailed observations about the knife wounds.

During his closing argument, Parker's attorney stipulated twice that Parker was at the Sennett home on the day of the murder and that Parker and Smith assaulted Dorlene. He argued that, consistent with May's testimony, Parker and Smith merely assaulted, cut, stabbed, and robbed Dorlene leaving her unconscious but alive. He maintained that, when Sennett returned to his home and found Dorlene, he murdered her to prevent her from divorcing him over the affair that he was having. He explained that, although only one knife had been admitted into evidence, there were two sets of knife wounds on Dorlene's body. He reminded the jury that Dorlene was alive when the paramedics arrived about 20 minutes after Sennett's emergency call and that the testimony indicated that she would not have survived long after being stabbed. He also reviewed with the jury that the exhibit knife was six inches long, one and one-quarter to one and one-half inches wide, and one-eighth inch thick, but that some of the knife wounds appeared to be two inches long, three-quarters inch wide, and one half inch thick.

In arguing for the death penalty, the prosecutor noted that:

certainly we have had some evidence of criminal activity on the part of [Parker]. It came out in the form of [] previous criminal activities,

26

about drugs, selling and using drugs. I believe there was some mention of stealing gasoline on one occasion. So again, there is evidence of prior criminal activity.

Exh. Vol. 9 at 1770.

He maintained that the jury should "do the right thing" by imposing a "proper verdict" of death, and asked "how many times, how many times does a person have to do something like this before . . . [being classified] basically as a bad person." Id. at 1777, 1780.

Despite the prosecutor's argument, the jury returned a verdict recommending, by a ten to two vote, that Parker be sentenced to life without parole. The Alabama Court of Criminal Appeals found that any error caused by the prosecutor's sentencing-phase comments was harmless "because the jury, by a vote of ten to two, recommended life without parole." Parker I, 587 So. 2d at 1095.

A petitioner cannot show sentencing phase prejudice when the jury recommends a sentence of life instead of death. Routly v. Singletary, 33 F.3d 1279, 1297 (11th Cir. 1994) (per curiam). Parker cannot, therefore, demonstrate that, but for the prosecutor's death penalty argument the outcome of the sentencing phase would have been different. The district court did not err in finding that the Alabama courts' decisions were neither contrary to nor an unreasonable application

27

of the law, and were not based on an unreasonable determination of the facts.

C. Failure to disclose information in violation of Brady v. Maryland

Parker contends that, despite his motions and requests for all favorable and exculpatory evidence, the prosecution failed to reveal that one of its witnesses, Teddy Lynn White, had more convictions than it initially disclosed. He maintains that the facts of White's additional convictions, his eligibility for release, the withdrawal of his initial release date, and his subsequent release were discoverable and highly prejudicial. He argues that the Alabama courts incorrectly interpreted Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963) by finding that the prosecutor's lack of knowledge of White's convictions or early release excused the prosecution from complying with Brady.

Parker moved for favorable and exculpatory discovery in May 1988 and in March and May 1989. In response to these requests, Alabama produced a statement of White dated 19 May 1989. In this statement, White explained that he was serving a sentence for burglary. White stated that, about one to two weeks before the murder, Parker had asked him to sell him a gun and had told White that he and "Kenny" planned to murder someone for money. Exh. Vol. 14 at 2672-76. At a pre-trial motions hearing, in response to Parker's Brady claims, the prosecutor explained that he had provided Parker's attorney with "a complete copy of [his]

28

file." Exh. Vol.1, R5 at 105.

During the trial, the judge overruled Parker's objection to White's testimony. Parker argued that the statement that the prosecution had provided to him did not indicate any exculpatory evidence, including White's criminal record. White then testified, consistent with his prior statement, about his conversation with Parker before the murder. White answered "Yes" when asked whether he had been convicted of a felony "on more than one occasion," and stated that all of his felonies were burglaries. Exh. Vol. 8 at 1483-84. He also responded that he had not been promised anything, including that there would be no objections to his release, in exchange for his testimony.

During the motion for new trial hearing, however, Parker's counsel learned that, at the time of White's testimony on 6 June 1989, White had been convicted of theft, receiving stolen property, burglary, and unlawful breaking and entering. White also had an earlier burglary conviction in 1985. Parker's counsel also learned that, although White was originally scheduled to be released on 24 May 1989, his release was delayed on 19 May 1989 (the same day that he provided his statement). White had submitted a request for the Supervised Intensive Restitution Program (SIR) in March 1989. His application was approved and he was scheduled for SIR release on 24 May 1989. On 10 May 1989, however, the

29

Lauderdale County District Attorney filed a "protest" to White's placement in SIR. Exh. Vol. 10 at 1845-46, 1850-51. On 26 May 1989, the prison's Director of Classification disapproved of the protest and advised that White was to be placed into SIR on 26 May 1989 "regardless of the protest." Id. at 1851, 1863-64. On 12 June 1989 (one week after his testimony in Parker's trial in Colbert County), White's release into SIR was approved and, on 14 June 1999, he was released from confinement and put into the SIR program.

On 18 May 1989, while White's SIR application was being reviewed, May was advised that White might have a connection with Parker's case. May attempted to have White interviewed immediately, but was unable to have the interview conducted until 19 May 1989.

On appeal, the Alabama Court of Criminal Appeals found that there was "no evidence that the prosecution *suppressed* any evidence whatsover." Parker I, 587 So. 2d at 1086. It noted that (1) the contention that White's testimony was secured in exchange for his release was "supported only by a coincidence of facts," (2) Parker was aware that White would testify before the trial, and (3) there was no evidence that the prosecution had obtained or had possession of White's arrest history or knowledge of his prior convictions. Id. at 1086-87.

The district court held that the Alabama court did not unreasonably apply the

Brady suppression element and that the decision was not based on an unreasonable determination of the facts. It also held that Parker failed to prove prejudice with regard to either claim.

Once a defendant requests the discovery of any favorable evidence material to either guilt or sentence, the prosecution's suppression of such evidence, whether in good or bad faith, violates due process. Brady, 373 U.S. at 87, 83 S. Ct at 1196-97. The prosecutor has a duty not only to disclose such favorable evidence but also "to learn of any favorable evidence known to others acting on the government's behalf . . . ." Kyles v. Whitley, 514 U.S. 419, 432, 437, 115 S. Ct. 1555, 1565, 1567 (1995). The duty exists whether or not the prosecutor knew of the existence of the evidence if the evidence was in the possession of the government arm or generally provided only to governmental entities. Martinez v. Wainwright, 621 F.2d 184, 186-87 (5th Cir. 1980). The prosecution does not, however, have an obligation to seek evidence of which it has no knowledge or which is not in its possession. United States v. Luis-Gonzalez, 719 F.2d 1539, 1548 (11th Cir. 1983). Further, there is no suppression if the defendant knew of the information or had equal access to obtaining it. Maharaj v. Sec'y of the Dep't of Corr., 432 F.3d 1292, 1315 n.4 (11th Cir. 2005). In Alabama, a defendant has access to convictions records which are "matters of public record" and "available

31

through counsel's own efforts."  Ex parte Perkins, 920 So. 2d 599, 606 (Ala. Crim. App. 2005) (per curiam).

To demonstrate a Brady violation, a defendant must show that:  (1) the cumulative effect of evidence was favorable because it was exculpatory or impeaching; (2) the evidence was willfully or inadvertently suppressed by the prosecution; and (3) the evidence was material; and (4) that the failure to disclose the evidence was prejudicial.  Bradley v. Nagle, 212 F.3d 559, 566 (11th Cir. 2000) (citation omitted).  The prosecution is not required to provide its entire file to the defense, but must disclose "material" evidence.  Stephens v. Hall, 407 F.3d 1195, 1203 (11th Cir. 2005) (citing United States v. Bagley, 473 U.S. 667, 675, 105 S. Ct. 3375, 3380 (1985)).  Excluded evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  Bagley, 473 U.S. at 682, 105 S. Ct. at 3383.

The Alabama Court of Criminal Appeals reasonably applied Brady in finding that the prosecutor did not suppress evidence of White's convictions.  The prosecutor provided Parker with all of the information that he had and there was no showing that the prosecutor had knowledge of White's other convictions.  White's

32

conviction record was available to Parker's attorneys and used by them in support of the motion for new trial. Further, Parker did not show prejudice. The jury heard White's testimony that he had multiple convictions for burglary; his convictions for theft and breaking and entering were not materially different enough to provide additional bases for discrediting his testimony. Further, even if White's testimony was discredited, same or similar testimony was presented that Parker was looking for a gun on the morning of the murder and that Parker admitted to participating in a murder for hire scheme.[25] Parker is, therefore, also unable to show materiality for White's arrest record.

There was also no showing that the Colbert County prosecutor had any knowledge related to White's release or of the delay of his release due to the protest filed by the Lauderdale County prosecutor. White's application for the SIR program was filed months before May learned of his connection with Parker, and was approved before White's interview or testimony. White testified that no one had promised him anything in exchange for his testimony, and May testified

---

[25] Donald Larry Buckman testified that, on the morning of the murder, Parker and Smith visited Buckman's home but stayed in Parker's car. Buckman said that Smith asked him if he knew where they could find a gun. After Buckman responded that he did not know, Smith asked if Buckman wanted to take a ride with them, but Buckman declined.

May testified that Parker said initially that he was given $1000 to allow Williams and Smith to use his car to kill Dorlene. Later, while testifying regarding Parker's admission to his participation in the crime, May said that Parker told him that after leaving the Sennett's residence, he and Smith drove to Williams' house where he collected $900 and that he had received $100 the day before to buy a handgun.

33

that no one had promised White a SIR release in exchange for his testimony. White's SIR supervisor also stated that no one in the Board of Corrections' chain of command, except possibly the Prison Commissioner or the prison's Director of Classification, could move a prisoner to SIR in exchange for his testimony in a case and that he knew of no one who had been so moved.

Parker has not shown that the Alabama Court of Criminal Appeals unreasonably determined the facts regarding his Brady claim as to White's release when it held that the claim was "supported only by a coincidence of facts" or unreasonably applied Brady in holding that he failed to prove that the prosecution suppressed knowledge of a release agreement. Parker I, 587 So. 2d at 1086-87.

D. Ineffective Assistance of Counsel

Parker argues that there were multiple deficiencies that resulted in ineffective assistance of counsel during the trial and sentencing. He explains that, although his attorneys recognized that they were not qualified or prepared to competently handle a capital trial, their motions for removal from the case were denied.

In order to present a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687,

104 S. Ct. 2052, 2064 (1984). The defendant must make both showings in order to establish that the conviction or sentence was caused by "a breakdown in the adversary process that renders the result unreliable." Id. at 687, 104 S. Ct. at 2064. The deficient performance inquiry focuses on "whether counsel's assistance was reasonable considering all of the circumstances," and is judged under an "objective standard of reasonableness." Id. at 687-88, 104 S. Ct. at 2064-65. The petitioner bears the heavy burden of proving that "no competent counsel would have taken the action" taken by his counsel. Callahan v. Campbell, 427 F.3d 897, 933 (11th Cir. 2005) (quotation marks and citation omitted). "Because of the difficulties inherent in making the evaluation [of reasonable assistance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "the defendant must overcome the presumption that, under the circumstances, the challenged action" could be considered trial strategy. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Although the Strickland presumption is demanding, it is not insurmountable. Chatom v. White, 858 F.2d 1479, 1485 (11th Cir. 1988). It can be met when the deficient actions center on a single sufficiently egregious and prejudicial incident. Id. And it may be assessed against the seriousness of the charges filed against the defendant. Magill v. Dugger, 824 F.2d 879, 886 (11th Cir. 1987). Additional, but

35

cumulative, evidence which could have been presented does not, however, establish ineffective assistance. <u>Van Poyck v. Fla. Dep't of Corr.</u>, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002) (per curiam).

1. Parker's Intoxication and Impairment at the Time of Statement

Parker maintains that his attorneys were ineffective because they failed to address his impairment at the time of his statement and failed to hire expert witnesses who could specifically address this impairment in testimony at the suppression hearing.

During the suppression hearing, Fountain testified that she had been with Parker the entire day of the arrest and that he had begun drinking beer and smoking marijuana early in the day. Fountain said that Parker drank at least "six to eight" beers and had smoked at least "[f]ive to six joints" of marijuana that day. Exh. Vol. 2 at 238-239, 248. She commented that he had also been "shooting up" Talwin, but she did not recall seeing him do so on the day of the arrest. <u>Id.</u> at 238-39, 248.

May testified that Parker asked to speak with him sometime after 5:45 in the afternoon on 31 March 1988. May met with Parker and, after advising Parker of his <u>Miranda</u> rights, Parker made his statement. May explained that he was trained to look for evidence of drug or alcohol use during interrogations but that he did not

36

detect any signs of drug or alcohol impairment on Parker and that Parker appeared to understand what he was saying. May testified at trial that, after Parker began his initial statement, he asked Parker whether he was telling the truth and Parker changed his story.

Dr. James Edward Crowder, a local clinical psychologist, testified. Based on the evidence of Parker's alcohol and drug use at the time of his arrest, Crowder opined that Parker would "have had a reduction in his ability to withstand pressure [and] frustration and . . . would have had to some extent an impairment in his judgment." Exh. Vol. 2 at 259-60. On cross-examination, he conceded that an experienced drinker could develop a tolerance to alcohol that would permit him to function with a higher level of alcohol. Crowder explained that, if Parker's judgment was impaired by alcohol or drugs, he might be inclined to act in a manner "not in his best interest." Id. at 262. He conceded that evidence of Parker's requests for visits with investigators in the days following his first interview might indicate that his judgment had not changed much between his first and subsequent visits.

During the post-conviction hearing, Dr. Peter Breggin testified as an expert in psychiatry, forensic psychiatry, and drug abuse, and Dr. Emanuel Hriso as an expert of neuropsychiatristry and addiction. Based on the evidence of Parker's

37

alcohol and drug use on the day of his arrest[26], Breggin opined that by the time of his statement at 5:30 P.M., Parker would have been in a mixed state of alcohol and marijuana intoxication and alcohol withdrawal. He explained that Parker would have been suffering from anguish, desperation, discomfort, and pain as a result of alcohol withdrawal compounded by his inability to inject Talwin. Breggin stated that the combination of withdrawal, brain damage, and neuropsychological deficits would have altered Parker's judgment and made it more difficult for him to control his impulses. He explained that, "driven by a combination of intoxication[,] addiction withdrawal[,] and memory problems" "more than his will," he may have understood the basic questions but would have felt "an extreme amount of urgency to say yes to anything that he thought would get him . . . home." Exh. PC Vol. 11 at 202-03. He noted that the sedative drugs that Parker was using, alcohol and marijuana, would have acted as a truth serum to "loosen his control over his own willful processes." Id. at 203-06.

Hriso commented that Parker's alcohol and marijuana use could sedate and impair Parker's judgment so that he could not control his normal defenses and would not be unable "to make correct declarations." Exh. PC Vol. 14 at 717-18.

---

[26] Although Breggin also explained that Parker was addicted to intravenous injections of Talwin and the problems associated with such, the trial judge reminded him that there was no evidence of Parker's use of Talwin on the day of his statement.

He also noted that Parker would have been vulnerable to Talwin withdrawal, to an impaired judgment, and to an inability to understand the exact meaning of words spoken to him. Hriso explained that, because erratic behavior was expected in such a state, it was understandable that Parker would have asked to speak to May and had confessed to the crime.

The determination of a confession's voluntariness requires an examination of the totality of the circumstances and ultimately requires an inquiry into whether the statement was "the product of an essentially free and unconstrained choice." Hubbard v. Haley, 317 F.3d 1245, 1252-53 (11th Cir. 2003) (citation and quotation marks omitted). We consider a number of factors, and the presence of one alone is not determinative. Id. at 1253. A confession that was not the product of free will and rationale intellect or that was made when the individual's will was "overborne" by physical, psychological, or drug-induced means, is inadmissible. Townsend v. Sain, 372 U.S. 293, 307, 83 S. Ct. 745, 754 (1963), overruled on other grounds by Kenney v. Tamayo-Reyes, 504 U.S. 1, 5, 112 S. Ct. 1715, 1717 (1992). In determining whether or not a confession is constitutionally voluntary, the truth or lack thereof of the statement is irrelevant. See Rogers v. Richmond, 365 U.S. 534, 544, 81 S. Ct. 735, 741 (1961).

In Alabama, although a confession will be deemed inadmissable if the

defendant's mind was "substantially impaired" at the time of the confession, "[i]ntoxication, short of . . . impairment of the will and mind as to make the individual unconscious of the meaning of his words, will not render a statement or confession inadmissable." Free v. State, 495 So. 2d 1147, 1156 (Ala. Crim. App. 1986) (citation and quotation marks omitted). The voluntariness determination is a matter of law for the trial court, and that court's decision will not be reversed unless it is manifestly wrong or contrary to the great weight of the evidence. Id.

The state courts rejected this claim because there was not a reasonable probability that the outcome of the suppression hearing would have been different with the experts' testimony or that the exclusion of Parker's statement would have changed the jury determination of guilt. The state trial judge found that "[n]othing presented at the [post-conviction] hearing is of such nature that this Court would have ruled differently on [Parker's] suppression motion if this Court had been presented with this evidence at trial." Exh. PC Vol. 3 at 527. The state appellate court held that Parker failed to show that he was prejudiced by his attorneys' failure to call expert witnesses at the suppression hearing and therefore failed to show that his attorneys were ineffective. The district court correctly held that this conclusion was objectively reasonable. None of Parker's post-conviction experts examined Parker on the day of his statement; their testimony was based on his

medical history and their opinions that Parker would have been suffering

withdrawal or impairment. May did not detect any signs of impairment when

Parker made his statement, and Crowder indicated that Parker's subsequent contact

with the officers might indicate that he was no more impaired than he had been

during his first statement. Parker was cognizant of his situation when he began his

statement, and drove himself, Fountain, and a law enforcement officer to the

courthouse.[27]

The state court's factual determination that Parker exercised his free choice

was not objectively unreasonable or disproved by clear and convincing evidence.

The district court correctly held that the state court reasonably applied Strickland in

finding no prejudice. Parker also failed to prove deficient performance. His trial

attorneys did present evidence regarding the effects of his drug use at the

suppression hearing. Any additional evidence would have been merely

cumulative.

2. Experts Regarding the Murder and Weapon

Parker contends that his trial counsel failed to make proper use of the

evidence which showed that Parker, who was in Florence at 11:30 A.M., could not

---

[27] Despite conflicting testimony regarding who drove the car to the courthouse, the trial court accepted the testimony that Parker was the driver. There was no clear and convincing evidence presented to rebut this.

have inflicted the fatal stab wounds, which were inflicted no earlier than 11:42 A.M. He maintains that Veasey's testimony during the post-conviction hearing regarding the time of the fatal attacks bolstered Parker's theory of the crime and was actually consistent with the testimony of prosecution witnesses at trial. Parker also maintains that his attorneys were ineffective for (1) failing to present available evidence that Charles Sennett killed his wife after Parker and Smith left the Sennett residence, and (2) failing to call a qualified expert to address the prosecution's allegations that Parker's survival knife was the murder weapon. He maintains that none of the experts who testified at the trial were qualified to meaningfully address the relationship between Dorlene's wounds and the size and shape of the knife.

At trial, all three doctors who testified regarding the pathology of Dorlene's death indicated that the fatal stab wounds appeared to have been inflicted within minutes of the law enforcement officials' arrival at the Sennetts' home at 12:09 P.M. It is uncontested that Parker was not at the residence at that time. Dr. Emily Ward, the forensic pathologist who performed Dorlene's autopsy, described the wounds as "rapidly fatal" because they would cause death in no more than five minutes from blood loss and the accumulation of air in the chest cavity. Exh. Vol. 6 at 1012-13. Dr. McKinley believed that the primary fatal wounds were made to Dorlene's chest within 30 minutes of the emergency medical team's detection of a

pulse.[28]  Board certified forensic pathologist Dr. James Allen Barksdale opined that the wounds were inflicted "[w]ithin a very few minutes" of the emergency medical team's detection of a heartbeat.[29]  Exh. Vol. 8 at 1537.  May testified that his investigation confirmed that Parker was in Florence at 11:30 A.M. on the morning of the murder, and that it normally took about 30 minutes to drive from the Sennetts' home to Florence.

During the trial, there was conflicting testimony presented as to whether Parker's survival knife was the murder weapon.  Dr. McKinley did not believe that Parker's knife was the murder weapon.  He did not, however, examine the length and widths of the stab wounds to determine whether or not the knife matched the wounds.  Dr. Barksdale also reviewed the evidence and did not believe that Parker's knife was the murder weapon.  He admitted that he did not participate in the autopsy and that it was hard to make a judgment based solely on the pictures unless the view was "straight on."  Exh. Vol. 8 at 1540-41, 1544-45.

Dr. Ward testified that the size and irregularity of Dorlene's stab wounds matched the irregular, jagged back-side of Parker's survival knife.  She testified

---

[28]  The emergency medical team arrived at the Sennetts' residence at 12:09 P.M.  The team's report reflected a pulse rate "approximately 2 minutes or so after 12:09."  Exh. Vol. 6 at 1049.

[29]  During his questioning of Dr. Barksdale, Parker's attorney stated the evidence showed the time of the emergency medical team's detection as "approximately 12:15 P.M."  Exh. Vol. 8 at 1537.

that Dorlene sustained defensive wounds and did not likely survive more than five minutes after being stabbed. Alabama forensic supervisor John Kilborn testified that Parker's knife contained "one colorless wool fiber at the hilt" that was "similar" to the fiber on the afghan found at the Sennetts' home. Exh. Vol. 7 at 1348.

At the post-conviction hearing, Parker presented the testimony of board certified forensic pathologist Dr. Sparks P. Veasey. Veasey explained that, in examining a stab wound, a pathologist measures the length of the wound across the skin and the approximate depth of penetration. He said that the approximation of the wound depth could be the same size as the knife that inflicted the wound or vary from shorter to longer based on tissue differences, lung deflation, abdominal and skin flexibility, abdominal or chest wall compression, and the amount of force used. He rejected for lack of medical certainty Ward's statements regarding the correlation between th e wound and the knife and the "unusual" characteristics of the wound as necessarily being caused by a jagged or serrated edge. Exh. PC Vol. 14 at 809-12, 817, 819. Veasey noted that certain characteristics of the knife should have correlated with the wounds but did not. He pointed out that the knife admitted into evidence had a hilt or guard that separated the blade from the handle and that, if thrust forcefully into a victim, it would leave patterned abrasions or

contusion injuries around the wound which were not found on Dorlene's wounds. Veasey also explained that the width, or distance between the sharp and dull sides, of the admitted knife was inconsistent with the width of the wounds. Veasey opined that Dorlene's wounds, which consisted of both blunt trauma and cutting injuries, occurred at two separate times: the earlier blunt trauma episode in which she attempted to defend herself and was thus "cognizant" of the attack, and the later cutting episode, which showed no evidence of defensive actions and occurred within thirty minutes of the emergency medical team arrival. Id. at 835-41. On cross-examination, Veasey admitted that he had trouble seeing "certain details" from the wound pictures and that Dr. Ward would have been in a better position to see the wound details. Id. at 846-47. He conceded that Parker's knife could have been the murder weapon.

The state court noted that Veasey's testimony would not have changed the outcome of the trial but would have supported the prosecution's theory of the crime, and went to the weight of the evidence the jury placed on Ward's testimony. The state appellate court held that Parker was not prejudiced because the additional expert witness's additional testimony was cumulative. Parker's attorneys presented witnesses during the trial who testified that Parker's knife was not the murder weapon. Because Veasley's testimony would have been cumulative, the

45

district court correctly held that the state court reasonably applied <u>Strickland</u>.

3. Expert testimony regarding Parker's brain damage and alcohol use

Parker argues that his trial counsel failed to present evidence regarding the full extent and impact of Parker's drug addiction and brain damage. He maintains that the post-conviction testimony of Doctors Breggin, Hriso, and Marson established the availability of substantial mitigating evidence that was neither cumulative nor substantially similar to other evidence.

At sentencing, Parker presented three witnesses: Joan Parker ("Joan"), Parker's mother; Dr. James Crowder, the clinical psychologist; and Charlotte Dean, Parker's eighth grade teacher. Joan testified that Parker was a very active child and suffered a head injury that left him unconscious for about two days when he was two years old. While Parker was in kindergarten and first grade, he was observed intensely shaking and vomiting in response to any kind of pressure, and had a short attention span. Joan took him to a doctor who diagnosed Parker with hyperactivity, put Parker on Ritalin so that he could sit still and listen, and advised her to place Parker in a school atmosphere that would permit him to learn at his own speed. The Ritalin calmed Parker but Joan did not give Parker the prescribed dosage because it interfered with his ability to sleep. When Parker was about 10 to 12 years old, he was taken off Ritalin. About the same time, Parker fell behind his

classmates scholastically and began to hang out with some older boys who supplied him with marijuana and alcohol. About six weeks after being removed from Ritalin, Parker began showing severe physical reactions. He did not adjust well to middle school and, despite Joan's pleas, was never placed into special education classes. When Parker was in middle school, he was placed in a six-week drug treatment program because of his parents' concerns about his marijuana and pill use. About four months after leaving the program, however, Parker slipped back into using drugs and alcohol. When Parker was 18, he returned to a drug treatment program. By 23 March 1988, however, Parker was using drugs intravenously. Joan explained that the only violent acts she observed from Parker were directed toward himself or inanimate objects.

Dr. Crowder saw Parker for evaluations in 1983 and in 1990 for emotional problems and treatment. He tested Parker using the Minnesota Multiphasic Personality Inventory for personality characteristics and mental illness diagnostics, the Wechsler Adult Intelligent scale, and a Wide Range [Academic] Achievement test to measure his scholastic achievements. The tests revealed that Parker had an intelligence quotient of 83, read and performed arithmetic at a seventh grade level, and felt that he was "not a very good person" and "inadequate when compared to other people." Exh. Vol. 9 at 1739-41. Crowder explained that the intelligence

and achievement tests indicated that Parker was not good at making decisions or judgments or retaining information for a long period of time, and was better at working with his hands than with words. Crowder noted that the personality inventory indicated that Parker felt "a great deal of guilt and remorse for his actions," had "trouble controlling his impulses," and was "anxious" and "restless." Id. at 1741-42. Crowder said that he knew of no significant Ritalin withdrawal symptoms.

Dean testified that Parker was a quiet, easy going student, but that she never felt that she was able to reach, inspire, or motivate him. She said that he "chose to run around with the wrong kind of people," became involved in drugs, and "seemed sad and melancholy most of the time." Id. at 1756-57. She commented that he had not matured emotionally, intellectually, or socially after the 7th grade but was never a discipline problem or violent and was accepting of authority.

During the post-conviction hearing, Parker's attorneys, H. Thomas Heflin and Gene Hamby, testified. Heflin said that he attempted to explain Parker's drug problem to the jury through Crowder's testimony and by introducing Parker's past medical records. He said that he and Hamby had discussed using Crowder as the expert and that they had also unsuccessfully attempted to contact Dr. Nyland, a neuropsychiatrist or psychologist, who had treated Parker. Heflin did not recall

48

any efforts to find a toxicologist or another psychiatrist, and used Crowder to discuss Parker's drug use because "he was the witness we had." Exh. PC Vol. 10 at 46; PC Vol. 11 at 135-36. Heflin did not discuss Crowder's qualifications with him and did not know if Crowder had testified in other criminal proceedings. Hamby recognized that Parker's mental abilities were "limited" due to his drug problems and head injury but was unaware of what an expert could do to explain those problems to the jury. Exh. PC Vol 13 at 528-59. Hamby explained that he called Crowder to testify because he was unable to find a psychiatrist who had treated Parker. Hamby did not remember considering hiring a toxicologist for the suppression hearing.

Clinical psychologist Glen David King testified for Alabama as an expert witness in clinical psychology and forensic examinations. After reviewing the trial record, including Parker's mental health records, King opined that Parker "well understood [and appreciated] the difference between right and wrong" at the time of the offense. Exh. PC Vol. 15 at 881-82, 886. He noted that Parker had evidenced his understanding of his actions by engaging in a series of goal-directed behaviors over a fairly lengthy period of time. He observed that Parker's actions included: (1) making a contract for pecuniary gain, (2) driving to the Sennetts' home, (3) committing the murder, and (4) attempting to cover the murder by

49

making it appear as a robbery, all of which evidenced a "consciousness of guilt."

Id. at 888-89. He believed that the combined effect of Parker's intelligence quotient and mental impairments from long-term poly-substance abuse and intelligence quotient was outweighed by his goal-directed sequence-patterned behaviors in the crime. King commented that

> individuals who commit crimes as a result of . . . serious mental illness or mental defect, usually commit crimes that are random in nature; they will often stay around the crime scene. It is fairly clear to people who observe them that they are operating under some delusion or hallucinatory compulsion, and none of these behaviors have been reported for Mr. Parker.
> . . .
> When somebody commits a crime under mental illness or mental defect . . . usually their behavior is random. It may not make sense to those who observe . . . from the outside. There doesn't appear to be much of an obvious motive behind it.
> [T]hey often engage in these kinds of random[,] unusual or peculiar behaviors on regular basis. It's not something that occurs once and doesn't occur again, or it doesn't occur for months at a time.

Id. at 889-90.

Parker's mitigation strategy was effective. The jury recommended a sentence of life without parole. The trial court, however, overrode the jury recommendation and sentenced Parker to death, finding that the aggravating circumstance of "[k]illing a human being, intentionally and deliberately, for money, evidence[d] a total and complete disregard for the value and uniqueness of human life" and outweighed the mitigating circumstances. Parker II, 610 So. 2d at

50

1181. It considered the mitigating circumstances of Parker's age, remorse, lack of

prior criminal history, and the jury's recommendation, but rejected the mitigating

circumstance regarding Parker's drug use. Id. at 1179-81. It found that Parker's

"capacity . . . to appreciate the criminality of his conduct or to conform his conduct

to the requirements of law" was not "substantially impaired." Id. at 1180.

Although it acknowledged Crowder's testimony regarding the impairments to

Parker's judgment caused by his drug use, it recognized evidence of Parker's

"actual actions during and after" Dorlene's murder which demonstrated the lack of

his impairment. Id. It noted that evidence of Parker's appreciation for the

criminality of his conduct and the possibility of his apprehension included his

placing cotton socks over his hands before the murder, throwing away the weapon

after the murder, making the scene look like a burglary, throwing away the stereo,

and burning his clothes. It found that there was "no proof" that Parker's drug

addition was based on his childhood medication for hyperactivity and that Parker's

childhood problems were "appropriately treated." Id.

   During the post-conviction proceedings, the state judge ruled that the expert

testimony regarding Parker's drug addition and brain damage was "substantially

similar" to the testimony offered at sentencing and that the other testimony of

Parker's drug use and mental problems was "cumulative, repetitive and

51

redundant." Exh. PC Vol. 16, R-60 at 530-32. Based on King's post-conviction hearing testimony, which was consistent with Bryant and Nagi's expert trial testimony, the state judge was not convinced that Parker had any appreciable brain damage relevant to the murder . The state judge concluded that "even if all of the expert testimony had been presented at the sentencing hearing, [she] would have still imposed the death penalty." Id. at 518; see also id. at 519 ("[Parker] would have received the death penalty even if the [post-conviction] testimony had been presented at sentencing."). The state appellate court noted that Parker failed to show prejudice as a result of his attorneys' failure to call additional expert witnesses because the evidence was cumulative and the experts did not establish that he had a mental defect, disease, or intoxication severe enough to provide a defense for his actions or was incapable of discriminating between right and wrong.

To show prejudice, Parker must prove that there is a reasonable probability that the sentencing judge would have arrived at a different conclusion after being presented with the additional evidence and reweighing the aggravating and mitigating circumstances. In Alabama, the trial judge is the ultimate sentencer in capital cases. Ala. Code § 13A-5-47 (1994). In this case, the sentencing judge was the same as the post-conviction judge and clearly stated that the sentence would

52

not have been different even with additional testimony. The district court did not err in finding that the state courts reasonably applied <u>Strickland</u> in rejecting his ineffective assistance of counsel claim.

E. <u>Probable Cause for Parker's Arrest</u>

Parker argues that there were no circumstances related to his detention on 31 March 1988 which justified his arrest without a warrant. He maintains that the actions and activities of the law enforcement officers at his residence and at the Sheriff's Office indicate that he was not free to leave and was under the custody and control of the Sheriff's Department. Alabama responds that, because the state court's decision regarding the use of Parker's statement was based on its application of <u>New York v. Harris</u>, 495 U.S. 14, 110 S. Ct. 1640 (1990), we need only address whether the Alabama Court of Criminal Appeals unreasonably applied <u>Harris</u> in finding that Parker's statements were admissible.

1. Veracity of the Informant

Parker maintains that his attorneys should have established that much of the information provided by the female confidential informant was available to anyone acquainted with him. He claims that his attorneys should have addressed the inconsistencies between May's affidavit and his testimony regarding the basis for the informant's information.

53

In March 1988, May executed an affidavit in support of a warrant to search a residence where he believed he would to find the VCR stolen from the Sennetts' residence. In the affidavit, May related that an unidentified person ("the Source") provided information that was not publicly available regarding Dorlene's murder, named the persons involved, and described a VCR stolen from the Sennetts' residence. May said that the Source claimed that "'the preacher' had paid Fifteen Thousand Dollars ($15,000) to have his wife killed." Exh. Vol. 13 at 2423. May explained that some of the information was corroborated by another unidentified person and by investigators who confirmed the location and description of the identified residences of the named individuals. May recounted that the Source said that the provided information was based on "personal observation and overhear[d] conversations involving one or more of the individuals named." Id. at 2428.

Parker's attorney moved to suppress Parker's statement, and argued that the police lacked probable cause for the arrest. At the suppression hearing, May testified that he obtained information regarding the crime from an anonymous informant on 28 March 1988. The informant provided: (1) the names of three individuals; (2) their roles in the murder; (3) their addresses and descriptions of their residences; (4) a description of their vehicles; and (5) the location as of 18 or 19 March 1988, and identifying information regarding the VCR stolen from the

54

Sennett home. May testified that the informant had advised that she had personally seen the VCR at Smith's residence. May explained that the information was verified by other investigators who confirmed the locations and descriptions of the named individuals' residences, the connection between the three named individuals, and the information regarding their vehicles. The investigators verified that John Forrest Parker existed, that he had a criminal record, and that he lived at 2613 Huntsville Road, Apartment B, Florence, Alabama. They also verified the information regarding his car, his physical description, his girlfriend, and his relationship with the other named individuals. Although a search warrant was issued regarding the VCR, no arrest warrants were to be issued until it was executed. Law enforcement teams were dispatched to each suspect's residence and instructed to do nothing else until further notice. The information regarding the VCR was then verified.

During the post-conviction hearing, May explained the inconsistencies in his affidavit and testimony. May explained that the informant obtained her information by being a "friend of [Smith's] family" and confirmed that, in the search warrant affidavit, he had indicated that her information was based on her personal observations or the conversations involving the named individuals that she had overheard. Exh. PC Vol. 15 at 1031-34. Although he agreed that

55

"reliability is . . . important," when asked why the basis of the informant's information was not shown anywhere in his notes, May responded that, "[a]t that . . . time[,] what she was telling me about who was involved in the murder was more important to me than how she was getting the information." Id. at 1033-35. May was questioned as to whether his affidavit was correct as to the amount of money paid for the murder, and responded that the information regarding the $15,000 was never corroborated or revealed by the investigation. May was also asked about his contact with a second anonymous informant. The second informant identified himself as "calling for a girl who knew all this but did not want to get involved" and corroborated some of the information provided by the Source. Id. at 1038. The second informant also identified Smith as a black male and said that he knew that the note found in Charles Sennett's pocket after his death read "I didn't kill my wife. I hired someone to." Id. at 1038-39. May responded that the Smith involved in the case was white and that Sennett's note did not say that he had not killed his wife or hired someone else to kill her.

The information provided by the informant established her basis of knowledge, reliability, and veracity. She provided numerous details about the crime, the defendants' actions after the crime, and the property taken during the crime. Her information was corroborated by independent law enforcement

56

investigations and her basis of knowledge was enhanced when the VCR was located where she indicated. Even though some of the information was publicly available, the informant's disclosure of it and law enforcement's confirmation of it supported the informant's credibility. Her credibility, however, was firmly established by her knowledge of the stolen VCR and the non-publicly disclosed details that connect Parker and his co-defendants to the crime. See Parker I, 587 So. 2d at 1088; Williams v. State, 565 So. 2d 1233, 1234-36 (Ala. Crim. App. 1990).

Under a totality of the circumstances review, the informant was a credible source for information regarding the crime and provided the police with information that Parker was involved in the murder-for-hire scheme that led to Dorlene's death. They knew that the VCR stolen from the Sennetts' home was located in one of the named suspects' homes. Thus, they had sufficient probable cause to believe that one of the named suspects had committed the murder.

In Williams, the court found that "the details of the informant's tip as corroborated [were] sufficient both in number and specificity to establish [her] credibility." 565 So. 2d at 1236. It also found that the details indicating that she had either personally observed the facts or learned them from a crime participant supported an inference that she had an adequate basis of knowledge. Id. It noted

that, although the publicly-available information was entitled to little weight, the VCR information was significant and "the cumulative effect of *all* information gathered" met the standard of probable cause. Id. (quotation marks and citation omitted). On the issue of ineffective assistance, the state appellate court held that "in light of the fact that the informant described in . . . detail the VCR stolen during the murder and accurately stated where it could be found, the additional information [that Parker argued his attorneys should have introduced] was not likely to affect the trial court's finding" and that, therefore, Parker failed to demonstrate prejudice. Exh. Vol. Tab 61 at 2.

Parker's arguments fail. The accuracy as to the amount of money paid for the murder did not enter into the probable cause determination which was based on the totality of the confidential informant's verified information. The fact of her personal observation of the information was proven when the VCR was found where the informant said that she had seen it. The district court correctly found that the state court's determination was a reasonable application of Strickland.

2. Lack of Probable Cause for Parker's Arrest

Parker maintains that his attorneys failed to: (1) question the prosecution's witnesses concerning the inaccuracies in the informant's statements or the affidavit executed in support of the search warrant; (2) provide for an adequate foundation

58

for suppression of Parker's statement, and (3) adequately demonstrate that the law enforcement officers lacked probable cause for his arrest. He argues that evidence that the police approached his residence with their guns drawn and patted him down inside his home indicates that he was arrested inside his home. He contends that no intervening circumstances extinguished the taint of his illegal arrest and thus made his statement inadmissable. He asserts that his attorneys should have called Colbert County Sheriff's Office Investigator Doug Hargett who conceded that probable cause did not exist when Parker was taken into custody.

At the suppression hearing, Hargett testified that he and three other officers arrived at Parker's residence on 31 March 1988, observed the residence for 30 to 45 minutes, and were advised by May "to move in" after the VCR information was verified. Exh. Vol. 1 at 199-200; Exh. Vol. 2 at 214; Exh. PC Vol. 15 at 1059. They then knocked on the door and asked Parker to come out. As the officers approached the residence, they observed Parker looking out of a window and heard "what sounded [like] someone . . . running through the apartment." Exh. Vol. 2 at 213-14. Angela Fountain, who was in the residence, began screaming, and she and Tony Lakey were ordered out of the apartment. The police again ordered Parker out of the apartment and, after he stepped out, the officers patted him down and advised him of his rights. Fountain and Lakey both remembered seeing the

59

officers' guns drawn as they approached. The officers then asked Parker and Fountain to go downtown to be questioned. Parker and Fountain, accompanied by an officer, drove to the Colbert County Sheriff's Department.[30] At the Sheriff's Office, Parker was given Miranda[31] warnings by Hargett and May before he made any statements. The warrant for Parker's arrest was issued the next day, 1 April 1988.

During the post-conviction hearing, Hargett admitted that the officers had their guns drawn when they approached Parker's residence at 2613 Huntsville Road in Florence, Alabama to "follow up on information" that they had received from a confidential informant but stated that they did not plan to arrest Parker.[32] Exh. PC Vol. 15 at 978-79, 983-84, 986, 992, 1007, 1059. As they approached the residence, Hargett said that they heard screams and saw Fountain in the doorway. Hargett explained that they then ordered Fountain and Lakey out of the residence.

---

[30] It is unclear exactly who drove the car. May testified that, to the best of his knowledge, Parker "voluntarily drove" himself to Colbert County and was accompanied by Fountain, Fountain's baby, and Lauderdale County Sheriff's Officer Charles Perkins. Exh. Vol. 1 at 192; Exh. Vol. 2 at 201-02. Fountain said that she drove their car and that she was accompanied by Parker and one of the law enforcement officers. Hargett testified that Parker and Fountain voluntarily agreed to return to Colbert County, and permitted Perkins accompany them.

[31] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[32] Alabama City Police Investigator Robert Wilhite corroborated Hargett's testimony that the officers had their guns drawn and explained that he was requested to assist the Colbert County officers when they went to "pick up" Parker. Exh. Vol. 13 at 578, 588.

Hargett said that, once Parker appeared in the foyer, the officers asked him if they could speak with him and put away their weapons. Parker was patted down for weapons inside his living room and then ordered out of the residence. At the officers' request, Parker and Fountain agreed to accompany the officers to the Colbert County Sheriff's Office and to allow Lauderdale County Sheriff's Investigator Charles Perkins to ride with them. Hargett explained that Perkins rode with Parker and Fountain to prevent them from discussing the murder.

Although Parker was not arrested until after he was interviewed at the Colbert County Sheriff's Office, Hargett opined that Parker was subjected to a warrantless arrest at his residence. May stated that he was told by the district attorney that Parker had been subjected to a warrantless arrest at his residence, and said that the arrest report also showed that Parker was arrested at his residence. Hargett was asked whether, after receiving confirmation from the other investigators about their search for the VCR, he had probable cause to arrest Parker. He responded that such information would "have given us more probable cause" but said he did not make a decision as to whether they would have had probable cause to arrest Parker at that time. Id. at 985.

Because of concerns for public safety and the expeditious apprehension of criminals charged with heinous crimes, law enforcement officers with reasonable

61

cause to believe that an individual has engaged in a felony may arrest without a warrant. Carroll v. United States, 267 U.S. 132, 156-57, 645 S. Ct. 280, 286 (1925). Probable cause exists where the facts and totality of the circumstances, as collectively known to the law enforcement officers and based on reasonably trustworthy information, are "sufficient to cause a person of reasonably caution to believe an offense has been or is being committed." United States v. Jimenez, 780 F.2d 975, 978 (11th Cir. 1986) (per curiam) (quotation marks and citation omitted); see United States v. Roy, 869 F.2d 1427, 1433 (11th Cir. 1989). In determining probable cause based in part on confidential informant information, a court should consider not only the totality of the circumstances but also the "closely intertwined issues" of the informant's basis for knowledge, reliability, and veracity. Illinois v. Gates, 462 U.S. 213, 230, 103 S. Ct. 2317, 2328 (1983).

Under the Fourth Amendment, police are prohibited from making a warrantless arrest and nonconsensual entry into a suspect's home to make a routine felony arrest. See Payton v. New York, 445 U.S. 573, 588-90, 100 S. Ct. 1371, 1381 (1980). Such an arrest may be made, however, if the officer has probable cause to believe that the suspect has committed an offense and where exigent circumstances exist which make obtaining a warrant imprudent, see Payton, 445 U.S. at 589, 100 S. Ct. at 1381. Such exigent circumstances may include (1) the

62

"violent nature of the offense with which the suspect is to be charged;" (2) "a reasonable belief that the suspect is armed;" (3) "probable cause to believe that suspect committed the crime;" (4) firm reasons to believe that the suspect is in the home; (5) a reasonable belief the delay could allow for the destruction of essential evidence; (6) a reasonable belief that delay could jeopardize the safety of the law enforcement officers or the public; and (7) a peaceful state of the entry. Bush v. State, 523 So. 2d 538, 546 (Ala. Crim. App. 1988).

Evidence, including verbal statements, obtained as a result of an unlawful search are subject to exclusion. See Wong Sun v. United States, 371 U.S. 471, 485,  83 S. Ct. 407, 416 (1963). Although its purpose is to prevent lawless conduct by law enforcement officials, the exclusionary rule is not to be "interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." Brown v. Illinois, 422 U.S. 590, 600, 95 S. Ct. 2254, 2260 (1975) (quotation marks and citation omitted). An inquiry as to the applicability of the exclusionary rule must address whether the evidence or "fruit of the poisonous tree" was obtained by the "exploitation of that illegality or instead by means sufficiently distinguishable [from the illegal action] as to be purged of the primary taint." Wong Sun, 371 U.S. at 488, 83 S. Ct. at 417 (internal quotations and citation omitted). Where, however, the police have probable cause to arrest a

63

suspect, the exclusionary rule does not bar the prosecution's use of the defendant's statement made outside of his home, even if the statement was taken after an illegal arrest made in the home. Harris, 495 U.S. at 21, 110 S. Ct. at 1644-45.

In this case, the question is whether the information known to the law enforcement officers at the moment of Parker's courthouse confession was sufficient to establish probable cause for his arrest. Probable cause was based on corroborated information from a female confidential informant and not from verifiable false information from a male informant. Probable cause was based on both the detailed public information provided by the informant and the specific information regarding the VCR. Parker is unable to show prejudice or unreasonable performance by his counsel because the evidence of the male informant had no bearing on the court's admissibility of his statement. Parker is also unable to show prejudice or deficient performance as a result of Hargett's statement during the post-conviction hearing that Parker was subjected to a warrantless arrest at his residence. Hargett did not possess all of the information regarding probable cause, did not make the decision about probable cause, and did not ultimately make a determination about the admissibility of Parker's statement.

On direct appeal, the state appellate court noted that the facts supplying probable cause for Parker's arrest were "virtually identical" to those identified in

Williams, 565 So. 2d at 1236. Parker I, 587 So. 2d at 1088. In addressing ineffective assistance of counsel, the Alabama Court of Criminal Appeals held that Parker had failed to demonstrate prejudice because his "claims concerning arrest at home and intervening events are irrelevant because the trial court found that the tip of an anonymous informant was sufficiently corroborated to supply probable cause for [Parker's] arrest." Exh. PC Vol. 16, Tab 61 at 2. Further, at the time of Parker's statement, he was outside of his home and the police had probable cause for his arrest. His statement was, therefore, admissible. See Harris, 495 U.S. at 21, 110 S. Ct. at 1644-45. The district court correctly held that the state court reasonably applied Strickland's prejudice element because further evidence of an in-home arrest would not have affected the admissibility of Parker's statement.

Parker is also unable to prove deficient performance because this evidence was cumulative. The trial court heard Fountain and Lakey's testimony that Parker did not go out of his house when called by the officers and that the officers went into the house looking for him with their guns drawn and still admitted his statement.

Because the police had probable cause to arrest Parker when he made his statement, his statement was admissible regardless of whether or not he was arrested in his home. The district court correctly held that the state court's decision

65

was neither contrary to nor involved an unreasonable application of law.

3. Questions Regarding Parker's Statement

Parker maintains that his attorneys failed to address either the temporal proximity between his first contact with the officers and his statement, or the effect of his intervening meeting with Fountain, who was very upset at that time. He also contends that his attorneys failed to address his impairment at the time of his statement.

Parker arrived at the Sheriff's Department at 3:35 P.M. "[A] few minutes" after his arrival, he was interviewed by Hargett and began making a statement at 4:38 P.M. Exh. Vol. 2 at 203, 205. The interview stopped at 5:30 P.M. and Hargett left the room. Parker was then permitted to visit with Fountain for about three minutes. She had been interviewed by law enforcement officers and advised that she needed to cooperate if she wanted to see her baby again. During her visit with Parker, she had the baby with her and told Parker that the officers had advised her to tell him that they believed that she and Parker were involved in a murder, and that Smith and Williams were "blaming everything on [Parker]." Id. at 236-37, 242-43. At 5:45 P.M., Parker was interviewed by May and, shortly thereafter, he made his second and inculpatory statement.

During the suppression hearing, the prosecutor referenced Fountain's

meeting with Parker in his summation and Parker's attorney responded by citing

Taylor v. Alabama, 457 U.S. 687, 691-92, 102 S. Ct. 2664, 2667-68 (1982).

Although this issue was not specifically addressed on direct appeal, the Alabama Court of Criminal Appeals did state that it had "reviewed the testimony" from the suppression hearing and found no error in the trial judge's admission of his statement.  Parker I, 587 So. 2d at 1088.

The question of whether a defendant's statement, given after an illegal arrest and Miranda warnings, "is the product of a free will . . . must be answered on the facts of each case.  No single fact is dispositive."  Brown, 422 U.S. at 603, 95 S. Ct. at 2261.  The relevant factors in making the threshold determination of voluntariness include the Miranda warnings, "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct."  Id. at 603-04, 95 S. Ct. at 2261-62 (internal citation and footnote omitted).  The prosecution bears the burden of showing admissibility.  Id. at 604, 95 S. Ct. at 2262.

The temporal proximity factor is evaluated based on, inter alia, the length of time between the arrest and the confession and any intervening significant events. A statement made "several days" after an illegal arrest is too temporally distant to warrant admission.  Id. at 605 n.11, 95 S. Ct. at 2262 n.11.  Intervening significant

67

events may include a lawful arraignment and the release from custody. See id. The admission of Miranda warnings alone; a short five to ten minute visitation with friends, one of whom was emotionally upset; or the issuance of an arrest warrant are not, individually or collectively, considered significant intervening events. See id. at 602, 95 S. Ct. at 2261 (Miranda warnings alone); Taylor v. Alabama, 457 U.S. 687, 691-92, 102 S. Ct. 2664, 2667-68 (1982) (Miranda warnings, short visitation, arrest warrant).[33] Absent intervening significant events, statements given within two hours to six hours of an arrest have been suppressed. See Brown, 422 U.S. at 604-05, 95 S. Ct. at 2262 (two hours with no intervening significant events); Dunaway v. New York, 442 U.S. 200, 203 n.2, 218-19, 99 S. Ct. 2248, 2252 n.2, 2260 (1979) (less than an hour and no intervening significant events); Taylor, 457 U.S. at 691, 102 S. Ct. at 2667 (six hours and defendant "was in police custody, unrepresented by counsel, . . . questioned on several occasions, fingerprinted, and subjected to a lineup"). Exclusionary purpose and misconduct is demonstrated when the arrest was for "investigatory" reasons and was effected "to

---

[33] In Taylor, the petitioner was permitted to have a short visit with his girlfriend and a friend, after he had signed a waiver-of-rights form and before he confessed. 457 U.S. at 691, 102 S. Ct. at 2667. The girlfriend was, however, "emotionally upset" after "hearing the officer advise the petitioner to cooperate." Id. at 692 n.1, 102 S. Ct. at 2668 n.1. The Court noted that the visit was not only "[in]sufficient to break the connection between the illegal arrest and petitioner's confession" but may have had the "opposite effect" on the petitioner's ability to consider carefully and objectively his options and to exercise his free will." Id. at 691-92, 102 S. Ct. at 2667-68.

cause surprise, fright, and confusion."  Brown, 422 U.S. at 605, 95 S. Ct. at 2262

("investigatory" arrest); Dunaway, 442 U.S. at 218-19, 99 S. Ct. at 2260

("investigatory" arrest not cured by police's lack of threats, and abuse, or

"protecti[on] of defendant's Fifth and Sixth Amendment rights"); Taylor 457 U.S.

at 693, 102 S. Ct. at 2668-69 ("investigatory" arrest not cured by police's lack of

physical abuse or defendant's "voluntary" confession).

The state appellate court found that Parker's claims regarding his arrest at

home and the intervening events between his arrest and his statement were

"irrelevant" because probable cause was established by corroboration of the

confidential informant's information.  Exh. PC Vol. 16, Tab 61 at 2.  It concluded

that he failed to show prejudice arising out of his counsel's failure to challenge the

temporal proximity or the impact of his meeting with Fountain and did not show

that his attorney was ineffective.  Id.  The district court did not err in finding that

state courts reasonably applied the law and that its determinations were not based

on an unreasonable interpretation of the facts.

### III.  CONCLUSION

Parker filed this appeal seeking federal habeas relief from his conviction and

death sentence for the murder of Dorlene Sennett.  We hold that Parker received

effective assistance of counsel because Parker is unable to show prejudice from his

attorneys' representation during his motion to suppress, at trial, and at sentencing. The jurors who were stricken from Parker's trial were not similarly situated with those who were seated. The prosecutor's comments during his closing arguments, though improper, did not prejudice Parker and were cured by the trial court's extensive cautionary jury instructions. There was no evidence that the prosecution suppressed any evidence regarding their witness, and Parker was aware that the witness would testify before trial. Probable cause for Parker's arrest was established when the confidential informant's information was corroborated by law enforcement officials. Because Parker is not entitled to relief on any of his claims, the judgment of the district court is

AFFIRMED.


EDMONDSON, Chief Judge, concurs in the result.